**Pauline VELEZ, Plaintiff,**

v.

**James G. ROCHE, Secretary of the U.S. Department of Air Force, Defendant.**

No. C–02–0337–EMC.

United States District Court, N.D. California.

June 30, 2004.

Jack W. Lee, Brad Yamauchi, Minami Lew & Tamaki LLP, San Francisco, CA, for Plaintiff.

Claire T. Cormier, United States Attorney's Office Northern District of California, San Jose, CA, Suzanne G. Ramos, United States Attorney's Office Northern District of California, San Francisco, CA, for Defendant.

## ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT AS MATTER OF LAW OR NEW TRIAL; DENYING REQUEST FOR REMITTITUR (Docket No. 207)

CHEN, Magistrate Judge.

Having considered the parties' briefs and accompanying submissions as well as the argument of counsel, and good cause appearing therefor, the Court hereby DENIES Defendant Air Force's ("AF") motion for judgment as a matter of law ("JMOL") or new trial as well as its request for remittitur.

### I. FACTUAL & PROCEDURAL BACKGROUND

Plaintiff Pauline Velez filed suit against the AF, alleging discrimination on the basis of gender. In her complaint, Dr. Velez asserted four causes of action: (1) gender discrimination based on disparate treatment, (2) gender discrimination based on hostile work environment, (3) failure to prevent gender discrimination, and (4) pregnancy discrimination. The AF moved for summary judgment which the Court granted in part and denied in part. *See* Docket Nos. 76, 117 (orders of 12/10/03

and 1/7/04). The summary judgment order left for trial only the disparate treatment and hostile work environment claims. In the summary judgment order, the Court rejected the AF's argument that there was no genuine dispute that it was not Dr. Velez's employer for purposes of Title VII, either under a direct employer or indirect employer theory.

Subsequently, a jury trial was held in which the jury found in favor of the AF on the disparate treatment claim but in favor of Dr. Velez on the hostile work environment claim. The jury awarded Dr. Velez noneconomic damages in the amount of $505,623. It did not award Dr. Velez any economic damages.

## II. DISCUSSION

In its motion for JMOL or new trial and request for remittitur, the AF challenges the verdict on the hostile work environment claim. More specifically, the AF argues that JMOL or a new trial should be granted because (1) the AF did not have an employment relationship with Dr. Velez and (2) there was insufficient evidence that (a) the unwelcome conduct to which Dr. Velez was exposed was severe or pervasive and/or that (b) the AF failed to take prompt, effective remedial action reasonably calculated to stop the harassment. The AF also argues that a new trial should be granted because (3) the evidence related to California Business & Professions Code § 805 was prejudicial as was (4) the jury instruction on adverse employment action. Finally, the AF contends that (5) the jury's award of $505,623 should be reduced to $300,000 to reflect the Title VII statutory cap and then remitted to $75,000 and that (6) Dr. Velez's settlement with the VA should be used to offset the jury's award against the AF. The Court addresses each of the arguments below.

### A. Motion for Judgment as Matter of Law

"Judgment as a matter of law is appropriate when the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, which is contrary to the jury's verdict." *Omega Envtl. v. Gilbarco, Inc.*, 127 F.3d 1157, 1161 (9th Cir.1997); *see also McLean v. Runyon*, 222 F.3d 1150, 1153 (9th Cir. 2000) (same); *Baker v. Delta Air Lines*, 6 F.3d 632, 644 (9th Cir.1993) ("We must determine whether the evidence, considered as a whole and viewed in the light most favorable to the nonmoving party, reasonably can support only a verdict for the moving party.") (internal quotation marks omitted). "A directed verdict or JNOV [*i.e.*, judgment as a matter of law] is appropriate only where the evidence is such that, *without* weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion." *Id.* (internal quotation marks omitted; emphasis added).

#### 1. Employer Under Title VII

The AF's first argument is that JMOL should be granted because it did not have an employment relationship with Dr. Velez for purposes of Title VII. *See* Mot. at 3–4. In support of this argument, the AF relies primarily on a Sixth Circuit opinion that came out after this Court's summary judgment order but before trial. *See Shah v. Deaconess Hosp.*, 355 F.3d 496 (6th Cir. 2004).

In *Shah*, the plaintiff was a general surgeon who for many years had surgical privileges at the defendant hospital. *See id.* at 497. In 1999, the hospital revoked part of the plaintiff's surgical privileges after one of his patients died following surgery. *See id.* More specifically, the revocation occurred after a peer review of the plaintiff's conduct that proceeded

through numerous stages. *See id.* at 498. The plaintiff filed suit against the hospital claiming discrimination on the basis of age and national origin. *See id.* at 497.

The Sixth Circuit began its opinion by noting that, as a general matter, Title VII protects employees, not independent contractors. *See id.* at 499. "Three of our sister circuits have explicitly held that a physician denied hospital privileges is not protected by the federal employment discrimination statutes if he or she is an independent contractor." *Id.* (citing *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 261–63 (4th Cir.1997); *Alexander v. Rush North Shore Med. Ctr.*, 101 F.3d 487, 493–94 (7th Cir.1996); *Diggs v. Harris Hosp.-Methodist, Inc.*, 847 F.2d 270, 272–73 (5th Cir.1988)). The Sixth Circuit then went on to apply a common law analysis to determine whether a hired party is an independent contractor or an employee. *See id.* at 499. This analysis required the consideration of factors such as

> the hiring party's right to control the manner and means by which the product is accomplished; the skill required by the hired party; the duration of the relationship between the parties; the hiring party's right to assign additional projects; the hired party's discretion over when and how to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the hiring party's regular business; the hired party's employee benefits; and tax treatment of the hired party's compensation.

*Id.* at 499–500. The court concluded that "the record in this case fails to disclose any dispute regarding any of these factors." *Id.* at 500. The court noted, for example, that the hospital did not pay the plaintiff for his services or provide him with a W–2 form and that the plaintiff performed about 45 percent of his surgeries at other hospitals. *See id.* Although the court acknowledged that the hospital required all physicians having surgical privileges to abide by a certain standard of care,

> this requirement applies regardless of employment status and is enforced only after-the-fact, through the peer review process. Nothing in the record suggests that [the hospital] has the right to interfere with [the plaintiff's] medical discretion or otherwise control the manner and means of his performance as a surgeon. By [the plaintiff's] own admission, he treats his own patients and contracts freely with other hospitals. There is no evidence that [the plaintiff] must accept patients referred to him by the hospital, and, as far as the record discloses, [the hospital] does not dictate [the plaintiff's] hours or hire and pay [the plaintiff's] assistants.

*Id. Shah* thus suggests that, at least in the Sixth Circuit, simply because a hospital has the power to revoke a doctor's privileges does not mean that it has sufficient control to be her direct employer. *Cf. McPherson v. HCA–HealthOne, LLC*, 202 F.Supp.2d 1156, 1166–67 (D.Colo.2002) (stating that hospital's power to withdraw doctor's privileges—merely the privileges to use facilities, equipment, and staff—did not make doctor an employee instead of an independent contractor; if privileges could make a doctor an employee of hospital, then all doctors would be employees, "an obvious absurdity").

Even assuming the Sixth Circuit's holding in *Shah* governed here, it would not invalidate the jury verdict for two reasons. First, Dr. Velez did not rely simply on the abeyance as evidence of the AF's control over the terms and conditions of her employment. For example, there was evidence that, in spite of what the Concept of Operations stated, the joint venture between the AF and VA was, in actual opera-

tion, highly integrated. Indeed, there was evidence that there was a highly integrated Surgery Department in which AF and VA doctors worked together in teams on both AF and VA patients, all subject to the standard of care of the DGMC. Thus, VA surgeons worked on teams that included staff hired and paid by the AF. Also, there was evidence that the AF could control access to the DGMC surgery facilities and had authority in scheduling surgery by VA physicians. Moreover, in contrast to *Shah,* the evidence in the instant case established that all of Dr. Velez's surgery practice was performed at the DGMC, and there was no evidence that Dr. Velez retained the freedom to reject AF patients and treat only her own patients.

Second, *Shah* does not address the issue of when a hospital can be an *indirect* employer of a doctor, particularly when the doctor's discrimination claim is one for hostile work environment rather than disparate treatment. As discussed in this Court's prior summary judgment order, the Ninth Circuit has recognized that, to be liable, a defendant need not be the plaintiff's direct employer and that indirect employment may be a basis for liability under Title VII. *See Gomez v. Alexian Bros. Hosp. of San Jose,* 698 F.2d 1019, 1021 (9th Cir.1983) (agreeing with the D.C. Circuit's approach in *Sibley Memorial Hosp. v. Wilson,* 488 F.2d 1338 (D.C.Cir. 1973), and stating that Title VII covers those situations in which a defendant subject to the statute " 'interferes with an individual's employment opportunities with another employer' "). While the instant case is somewhat different from *Gomez* and *Sibley* as the latter cases involved outright denials of employment due to the defendant's interference with the plaintiff's employment opportunity (not the situation here), the reasoning of the cases is still applicable to the case at hand—*i.e.,* what is important is that the AF interfered with the terms, conditions, or privileges of Dr.

Velez's employment with the VA. *See Gomez,* 698 F.2d at 1021 ("The fact that plaintiff continues as an employee of AES does not mean the employment relationship between AES and plaintiff has not been interfered with. The conditions of plaintiff's employment are different than they would have been had he not been discriminated against [by defendant]."). Title VII prohibits not only discriminatory discharges or refusals to hire but also discrimination with respect to "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2(a)(1).

Although the Ninth Circuit has not squarely addressed whether the *Gomez/Sibley* theory of liability applies when a plaintiff's claim is one for hostile work environment rather than disparate treatment, the court's opinion *Anderson v. Pacific Maritime Ass'n,* 336 F.3d 924 (9th Cir.2003), is instructive. In *Anderson,* the plaintiffs were African American longshoremen who sued a nonprofit association known as the Pacific Maritime Association ("PMA"). *See id.* at 925. The PMA was an association of the stevedoring and shipping companies that employed the plaintiffs. *See id.* at 926. According to the plaintiffs, they were subjected to a racially hostile work environment while employed on the waterfront in Seattle and Tacoma, Washington. *See id.* The Ninth Circuit held that the PMA was not liable under an indirect employer theory because

[a]ll of our cases employing *Sibley's* rationale—and indeed *Sibley* itself—have done so in instances where the indirect employer was the entity performing the discriminatory act....

Here, on the other hand, the hostile work environment did not occur at any facility controlled by PMA, but instead at the docks and waterfront facilities controlled by the member-employers that actually employ and supervise the

Plaintiffs and their putative harassers on the job site.

*Id.* at 931. The Ninth Circuit then stated:

> *Sibley* and its Ninth Circuit progeny condone liability when there exists discriminatory "interference" by the indirect employer and where the indirect employer had some peculiar control over the employee's relationship with the direct employer. Here, there was no such interference by PMA. *It did not cause the hostile work environment. And its power to stop the hostile work environment was so limited that it cannot be said to have "interfered" by failing to take corrective measures to stop the harassment when the power to take those measures belonged to the member-employers.*

*Id.* at 932 (emphasis added). Implicitly, the court in *Anderson* recognized that a Title VII plaintiff could assert a claim for hostile work environment against an indirect employer when the indirect employer *did* cause the hostile work environment or when it *had* the power to stop the hostile work environment such that its failure to do so constituted interference with the terms, conditions, or privileges of the plaintiff's direct employment.

In short, nothing in the logic of *Gomez, Anderson,* or any other Ninth Circuit authority suggests that the indirect employer analysis should not extend to a hostile work environment claim where warranted by the evidence. Nor has the AF provided any substantial reason to limit *Gomez.*

Significantly, numerous other courts have expressly recognized application of the indirect employer analysis to hostile work environment situations. For example:

In *Garrett v. Information Systems & Networks Corp.,* No. 5:97–CV–436–BR1, 1997 U.S. Dist. LEXIS 20845 (E.D.N.C. Nov. 21, 1997), the plaintiff worked for a company called I–Net. She alleged that she was sexually harassed by an employee of a company called ISN while she was a contract worker with the U.S. Postal Service ("USPS"). The plaintiff argued that I–Net was liable as her employer, that the USPS was liable because she worked on its premises and it directed her duties, and that ISN was liable because it knew that one of its employees was harassing her. In response to ISN's argument that it could not be held liable, the court stated that, under *Sibley,* it could be. "To allow a defendant to evade liability for allegedly allowing an employee to create a hostile working environment simply because the victim of the alleged harassment was not its employee would undercut the remedial purpose of Title VII." *Id.* at *6.

In *King v. Chrysler Corp.,* 812 F.Supp. 151 (E.D.Mo.1993), the plaintiff worked for a company called Canteen, which operated a cafeteria for the employees of Chrysler on Chrysler's premises. The plaintiff alleged that she was sexually harassed by a Chrysler employee; Chrysler argued that it lacked the requisite employment relationship with the plaintiff to be held liable. The court ruled against Chrysler, stating that, if it "were to accept Chrysler's position that it is not a proper defendant, Chrysler could allow a hostile work environment to exist because of the peculiar circumstances of its relationship with Canteen, although it could not do so if [the plaintiff] were in its own service." *Id.* at 153 (citing *Sibley*). The court added that this was a case in which a Chrysler employee actually participated in creating the hostile work environment; the court was not being asked to impute conduct from Canteen to Chrysler. *See id.*

In *Moland v. Bil–Mar Foods,* 994 F.Supp. 1061 (N.D.Iowa 1998), the plaintiff was an employee of a company called IBP which assigned her to work in the scale house at the defendant's turkey processing

plant. The plaintiff's duties required her to weigh IBP trucks as they left the plant. IBP and the defendant's operations were interrelated only to the extent that the defendant had agreed to permit IBP to use its scale house to weigh IBP's trucks. IBP set the plaintiff's work schedule at the scale house, not the defendant, and IBP supervised her work, paid her, and provided her benefits. *See id.* at 1066–67. During her assignment to the scale house, the plaintiff was sexually harassed by one of the defendant's employees. The plaintiff complained, after which the defendant contacted IBP and requested that the plaintiff no longer be assigned to work in the scale house. IBP then told the plaintiff that she would no longer be assigned to work at the scale house due to the defendant's request. *See id.* at 1067. The court held that, even though the plaintiff was not the defendant's employee, she had asserted a valid Title VII claim because the defendant controlled the plaintiff's access to employment opportunities. *See id.* at 1073.

> Here, [the plaintiff's] authorized employment at [defendant's] weight station was terminated. She contends that her authorization to work at the weight station was revoked because of her unwillingness to work in a sexually hostile work environment. She further contends that the termination of her authorization to work at the weight station interfered with her employment at IBP. Accordingly, the court concludes that this segment of defendants' motion for summary judgment . . . is denied.

*Id.* (relying on *Sibley*).

In *EEOC v. Foster Wheeler Constructors, Inc.,* No. 98 C 1601, 1999 WL 515524, 1999 U.S. Dist. LEXIS 22955 (N.D.Ill. July 14, 1999), the plaintiffs were the employees of subcontractors who were allegedly subject to a hostile environment at a construction site run by defendant. The court "applie[d] the *Sibley* interference theory to find that subcontractors' employees who were employed by Title VII employers may sue [defendant] (a Title VII employer) for interfering with the conditions of their employment." *Id.* at *10, 1999 U.S. LEXIS 22955 at *33. In a footnote, the court pointed out that "[t]he parties appear to assume that [defendant's] maintenance of a hostile work environment can constitute 'interference' with the employment conditions of the subcontractors' employees." *Id.* at *10 n. 11, 1999 U.S. LEXIS 22955 at *33 n. 11.

In *Duncan v. Junior College Dist. of St. Louis,* No. 4:98CV01220 (CEJ), 1999 U.S. Dist. LEXIS 22451 (E.D.Mo. Nov. 15, 1999), the plaintiff was employed by a college but was assigned to perform her job duties at a General Motors facility. The plaintiff alleged that she was subject to a hostile work environment there. The court acknowledged that the plaintiff was not an employee of General Motors because the company did not pay her salary or give her any other benefits. *See id.* at *8. However, it held that, under the *Sibley* approach, General Motors could be held liable: "Plaintiff performed her job only at the GMC plant, GMC employees gave her work instructions, and a GMC employee with apparent, if not actual, authority over plaintiff was responsible for the allegedly hostile work environment. That hostile environment caused plaintiff to terminate her employment with the College." *Id.* at *9.

In *Diana v. Schlosser,* 20 F.Supp.2d 348 (D.Conn.1998), the plaintiff worked for a company that was in the business of providing on-air traffic reports for radio stations in exchange for advertising time on those stations. One of the stations for which the company provided such reports was the defendant. The plaintiff was assigned to do a report for the defendant. According to the plaintiff, she was subjected to a hostile environment by one of the

defendant's employees. The defendant argued that it was not the plaintiff's employer; the plaintiff agreed but argued that defendant "controlled the terms and conditions of her employment to such a degree that she [could] maintain a Title VII claim against [the defendant]." *Id.* at 350. The court ultimately agreed with the plaintiff, citing cases in which plaintiffs were allowed to pursue Title VII relief against defendants who were not plaintiffs' employers because they had "significant control over the plaintiffs' ability to work or obtain employment." *Id.* at 352. The court noted:

> In this case, [the defendant] had significant control over [the plaintiff's] ability to maintain a substantial employment opportunity, even though she was not an employee of [the defendant]. This type of arrangement is not atypical of the present-day workplace where employees of different employers often work side-by-side and where employment opportunities are controlled by those other than the direct employer. It would undermine the protections of Title VII if an employer could permit discrimination, and not be exposed to Title VII liability from certain employees whose employment opportunities it controlled, simply because those employees were not its own.

*Id.* at 352 (relying on *Sibley*).

In *Hunt v. Missouri,* 119 F.Supp.2d 996 (W.D.Mo.2000), the plaintiffs were nurses whose pay, benefits, vacation and income withholding were all handled by a private company that assigned contract nurses to various worksite throughout the country. The plaintiffs were assigned to work at a correctional center and were allegedly harassed by some of the correctional center employees. The court held that, based on the reasoning of *Sibley* and its progeny, the plaintiffs could bring a Title VII claim against the Department of Corrections. "Indeed, the case for subject matter jurisdiction is substantially stronger here than in [other cases in which] the plaintiffs were merely working at the defendant's job site but were, in fact, doing their own employer's work there. [The plaintiffs in this case] were effectively leased employees doing the work of the Department." *Id.* at 1002. (the court stated that, because it found *Sibley* applicable to this case, it did not address the question whether the plaintiffs were in fact dual employees of the private company and the Department. *See id.* at 1002 n. 3.)

■ Based on *Anderson* and the above cases, the jury was properly instructed and could well have found that, for Dr. Velez's hostile work environment claim, the AF could be held liable as her indirect employer. There was evidence at trial that the AF was liable as her indirect employer because it interfered with the terms, conditions, or privileges of her employment with the VA—more specifically, by causing and/or failing to stop the hostile work environment. The hostile work environment took place at the DGMC, an AF-controlled facility, and the AF had the power to stop the hostile work environment as the perpetrators of that environment were direct employees of the AF and thus subject to its control Notably, some of the alleged perpetrators of the hostile work environment were management-level employees such as Dr. Welling, who made certain pregnancy-related comments to Dr. Velez, and Dr. T.J. O'Neil, who participated in the decisions to subject Dr. Velez to the multiple reviews and the abeyance. *See Anderson,* 336 F.3d at 932 (concluding that there was no interference by indirect employer because it did not cause hostile work environment and its power to stop environment "was so limited that it cannot be said to have 'interfered' by failing to take corrective measures to stop the harassment when the power to take those

measures belonged to the member-employers").

Accordingly, the Sixth Circuit's decision in *Shah* does not impugn the verdict herein.

### 2. *Severe/Pervasive Conduct and Failure to Take Remedial Action*

The AF challenges the sufficiency of the evidence with respect to (1) the severity and pervasiveness of the conduct and (2) the AF's failure to take prompt, effective remedial action reasonably calculated to stop the harassment.

#### a. *Severity or Pervasiveness of the Conduct*

The AF asserts that, while each of its own witnesses denied the conduct of which Dr. Velez complaint, "even if it did take place, it was—at most—sporadic. As such, as a matter of law, it could not be sufficiently severe and pervasive so as to constitute a hostile work environment." Mot. at 9. As a preliminary matter, it should be noted that the test is not severe *and* pervasive but rather severe *or* pervasive. *See Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir.1991) ("The required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct."); *see also Schwapp v. Town of Avon*, 118 F.3d 106, 110–11 (2d Cir.1997) ("[W]hether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment.") (internal quotation marks omitted); *Etefia v. East Baltimore Community Corp.*, 2 F.Supp.2d 751, 758 (D.Md.1998) (denying defendant's motion for summary judgment because plaintiff testified that "comments about his heritage 'kept going on and on' " such that the conduct was more than a mere utterance or isolated incidents).

In the instant case, there was evidence that the conduct was more than just sporadic; indeed, there was evidence (*e.g.*, testimony of Dr. Velez, Dr. Zulim, Dr. Berguer, Dr. Brian O'Neill) that the sexually offensive comments and gender-motivated challenges to the competency of Dr. Velez and Dr. Zulim were frequent and constant. Moreover, there was evidence that the conduct consisted of not just offensive statements or competency challenges but also gender-based differential treatment (e.g. the critical reviews and abeyance of Dr. Velez's surgical privileges)..

This and other circuits have held that gender-based differential treatment may be considered as part of a hostile work environment claim. *See, e.g., McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1108–109, 1112–118 & nn. 5 & 7 (9th Cir.2004) (discussing incidents that could contribute to racially hostile environment, including different treatment of African American and white employees); *O'Rourke v. City of Providence*, 235 F.3d 713, 730 (1st Cir. 2001) (cautioning that "[c]ourts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment, then discounting the latter category of conduct"). The existence vel non of a hostile working environment is informed by the totality of the circumstances.

The AF contends, however, that any differential treatment cannot be considered because Dr. Velez did not prevail on the disparate treatment claim. While the jury did find for the AF on the disparate treatment claim, the special verdict form approved by the parties did not specify the basis of that verdict. The AF could have prevailed on the disparate treatment claim, which focused on Dr. Velez's reviews and abeyance, either because the differential treatment was not based on gender *or*

because the differential treatment did not constitute an adverse employment action (such as hiring or firing or demotion) since the abeyance was not reportable and thus did not affect her employment opportunities. Construing the evidence in the light most favorable to Dr. Velez (as it must in the context of a motion for JMOL), the Court holds that a reasonable jury could well have concluded that the differential treatment (i.e., the reviews and abeyance) was motivated by gender animus but did not rise to the level of an adverse employment action because it had no effect on Dr. Velez's then-current or future employment opportunities.[1]

The Court therefore concludes that, contrary to what the AF argues, there was sufficient evidence of severe or pervasive conduct. A reasonable jury could have found severe or pervasive conduct based on evidence that sexually offensive comments were frequently made and that there were repeated complaints about the competence of the two female surgeons (i.e., Dr. Velez and Dr. Zulim) that were not merit based (including not only informal comments but also the reviews and abeyance).[2] There was also evidence that Dr. Velez's reviews and abeyance, which took place over an intense period of time, contributed to the hostile work environment.

### b. *AF's Failure to Stop Harassment*[3]

■ As for the failure of the AF to take prompt, effective remedial action, the AF

---

1. Differential treatment may be considered as part of a hostile work environment even though it, in and of itself, does not reach the level of an adverse employment action. *See McGinest*, 360 F.3d at 1108–09, 1113–14 (citing as conduct that contributed to racial hostile environment evidence that white employees got things fixed when they asked, *e.g.*, vehicle tires; plaintiff's request was denied and he ended up in an accident); *McKenney v. New York City Off–Track Betting Corp.*, 903 F.Supp. 619, 622 (S.D.N.Y.1995) (noting that plaintiff's complaints of disparate treatment (*e.g.*, times for coffee breaks, rules of telephone usage) whether viewed as part of hostile environment claim or independently suggest continuing pattern of gender-animated harassment); *Cady v. Suny Cortland*, No. 96–CV–1229, 2000 WL 1456285, *8, 2000 U.S. Dist. LEXIS 14186, at *24–26 (N.D.N.Y. Sept. 19, 2000) (noting that plaintiff alleged hostile work environment based on conduct such as never being given advance of her schedule like male CPSO's, not receiving lunch breaks, having inadequate locker facilities reserved for female CPSO's, being excluded from pre-shift briefings, being denied her physical examination, background check, plus the opportunity to complete training at the police academy, and being criticized for this lack of training and subjected to more frequent performance reviews than male officers; adding that, "[a]lthough plaintiff complains about a number of unpleasant incidents which may be viewed as gender-neutral, she describes

enough instances of arguably sex-based conduct that a trier of fact could characterize the PSO as a hostile work environment").

2. The AF tries to downplay the offensiveness of the sexually offensive comments, but Dr. Velez's testimony demonstrates that the comments were more severe than suggested by the AF and, more important, that they were pervasive.

> It was beyond what even locker room talk usually is. There were at least weekly—most times that we [Dr. Velez and Dr. Zulim] were together there was something inappropriate that was said.
> For example, you know, walking out of a patient's room and somebody saying, did you check out the boobs on bed two, within almost hearing range of the room. Or every time there was a urinalysis on women, if they've had sex and they give a urinalysis, there's sperm present in the urinalysis. Everytime there was a urinalysis with sperm present in it, there was some comment about how easy she'd be to fuck or something along those lines. I mean, there's so many little things like that almost every single day.

Tr. at 293.

3. The Court notes that this argument of the AF has somewhat limited application given the hostile work environment claims asserted by Dr. Velez. For example, while Dr. Velez

argues that the evidence demonstrates that "each time [it] was informed, in Plaintiff's unspecific and understated way, it took prompt corrective action and the conduct of which Plaintiff complained stopped." Mot. at 13. The evidence supporting the AF's position is not persuasive. For example, relying on Exhibit BBB, the AF contends that, when Dr. Brian O'Neill told Dr. T.J. O'Neil about complaints made by women, Dr. T.J. O'Neil "reminded the relevant personnel to curtail any negative or disparaging comments." Mot. at 14 (citing Def.'s Ex. BBB). Exhibit BBB, however, does not appear to support this argument. On its face, the exhibit seems to be a response by Dr. T.J. O'Neil to "inflammatory rhetoric" by Dr. Peters; it does not say anything about complaints by women about the environment at the DGMC.

Also, there was evidence that the AF did *not* take prompt, effective remedial action. For instance, Dr. Welling, the chief of surgery at the DGMC, testified that he chose to lead implicitly by example, something which a reasonable jury could conclude was not adequate to prevent sexual harassment, especially in light of the testimony of Dr. Velez's expert Amy Oppenheimer, who discussed at some length steps that an employer can take to address harassment. *See also* Opp'n at 14 (noting that Dr. Welling simply testified that everyone should act professionally). There was also testimony by various witnesses about Dr. Welling's inadequate responses to the hostile environment. Dr. Zulim, for example, testified that, when she sought Dr. Welling's assistance, he responded by being critical of her and commenting that he did not understand why only she and

Dr. Velez had problems. Dr. Berguer testified that sexually offensive comments were made at surgery meetings when Dr. Welling was present but Dr. Welling did nothing to address them. Dr. Velez testified that, even when Dr. Welling did say something, the conduct would stop at the moment but then continue. There was also evidence of a failure to act by other AF management-level employees such as Dr. T.J. O'Neil. For instance, Dr. Brian O'Neill testified that he had multiple communications with Dr. T.J. O'Neil about numerous complaints regarding a sexually hostile environment at the DGMC, including from Dr. Velez, and that he asked the AF to take action but as far as he knew the AF did not do any independent investigation into the matter (at least, until Dr. Velez filed her EEO complaint). Dr. Brian O'Neill noted that the AF leadership seemed "interested and concerned" but "[t]he question was the extent to which that attitude reached the lowest levels within the hospital." Tr. at 655. Viewing the evidence most favorably to Dr. Velez, the jury could reasonably have concluded that the AF did not take adequate steps to stop the harassment.

## B. *Motion for New Trial*

██ "[A] trial court may grant a new trial, even though the verdict is supported by substantial evidence, if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *Roy v. Volkswagen of Am., Inc.*, 896 F.2d 1174, 1176 (9th Cir.1990) (internal quotation marks omitted). In considering

---

had the burden to prove that the AF failed to stop the harassment for her claim that she was exposed to a hostile work environment by a nonsupervisory employee(s), the AF had that burden for her claim that she was exposed to a hostile work environment by a

supervisor without an adverse tangible employment action. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 806, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *see also Swinton v. Potomac Corp.*, 270 F.3d 794, 803 (9th Cir.2001).

whether to grant a new trial, "the trial court may weigh the evidence and credibility of the witnesses, [but it] is not justified in granting a new trial merely because it might have come to a different result from that reached by the jury." *Id.* (internal quotation marks omitted). "[A] stringent standard applies when the motion [for a new trial] is based on insufficiency of the evidence. A motion will be granted on this ground only if the verdict is against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result." *EEOC v. Pape Lift, Inc.,* 115 F.3d 676, 680 (9th Cir.1997).

### 1. *Arguments Raised in AF's Motion for JMOL*

The AF argues that the Court should grant a new trial based on the same arguments raised in the AF's motion for JMOL. Although a court has more discretion to act in granting a motion for a new trial rather than in granting a motion for JMOL, this Court concludes that, for the reasons articulated above, a new trial is not appropriate. On each of the above points, there was substantial credible evidence supporting the jury verdict. The factual findings implicitly made by the jury were not "against the great weight of the evidence," nor is it "quite clear" that the jury reached a "seriously erroneous result." *Id.*

### 2. *Cal. Bus. & Prof.Code § 805*

The AF next contends that a new trial should be granted based on the Court's decision to admit evidence related to California Business & Professions Code § 805. According to the AF, the evidence should not have been admitted because it was overly prejudicial. The AF's argument here is based in part on an argument that

it previously made, that is, that any information about the statute is prejudicial because § 805 applies only to California licensed medical facilities, not the federal government. *See* Mot. at 16. In addition, the AF raises a new argument about the prejudicial effect of the evidence. The AF notes that the Court permitted Dr. Velez to testify on rebuttal about how the California Medical Association ("CMA") website information which mentioned § 805 affected her state of mind. According to the AF, the only period of time that Dr. Velez's state of mind was relevant was from February 23, 1993 (the day that Dr. Arbutina finalized his decision regarding the residency program at the DGMC) to May 13, 1996 (the day that the OCI report of investigation was issued); however, Dr. Velez's testimony indicated that she did not read the website information on § 805 until much later—around 2001. *See* Mot. at 15 (discussing deposition testimony given in 2003, in which Dr. Velez said that she came to the conclusion that the abeyance was reportable "[p]robably in the last two years"). The AF thus concludes that the evidence related to § 805 should not have been admitted and was prejudicial.

 As a preliminary matter, the Court notes that it did not admit into evidence § 805 itself.[4] Rather, there was only indirect evidence about § 805 in the form of the website information that Dr. Velez said she consulted and thus informed her state of mind as it related, *inter alia,* to her emotional distress. The issue as to the admissibility of the statute itself and Dr. Velez's request for judicial notice of the statute was extensively briefed and argued both before and during trial. The Court issued a ruling after careful consideration, holding that the text of § 805 would not be

---

**4.** For Court orders regarding evidence related to this statute, see Docket Nos. 164 (order of 1/26/04) and 184 (order of 2/2/04).

judicially noticed or admitted into evidence and presented to the jury. *See* Docket No. 184 (order of 2/2/04). Rather, based on the offer of proof (and testimony at trial) by Dr. Velez, the Court permitted Dr. Velez to describe the CMA website she saw which mentioned (but did not quote § 805) because that informed her understanding and state of mind as to the significance and consequence of the abeyance to her future employment opportunities (*i.e.*, its reportability). This affected her emotional distress.

Thus, the AF's argument that it was prejudiced because § 805 applies only to California licensed medical facilities, and not the federal government, is not persuasive. The website mentioning § 805 about which Dr. Velez testified was clearly relevant for the reasons stated above. Its reference to § 805 was not prejudicial because the statute was mentioned only incidentally and never quoted. The AF's argument that Dr. Velez's state of mind only between 1995 and 1996 was relevant is also without merit. In its order related to § 805, the Court stated: "Plaintiff has proffered that § 805 is also relevant to her state of mind. *Her reason for not applying for privileges at private hospitals and the emotional distress suffered is assertedly based in part upon her understanding of California law,* including § 805." Docket No. 184, at 3 (emphasis added). Evidence regarding Dr. Velez's reasons for not applying for privileges at private hospitals and the emotional distress she suffered beyond 1996 were relevant as she claimed future damages beyond that date. Finally, the Court notes that the outcome of this case strongly suggests there was no prejudice to the AF. To the extent the AF fears that evidence of § 805 could have erroneously led the jury to believe the abeyance was reportable, such a finding would have been relevant primarily to the claim of disparate treatment. The AF prevailed on that claim.

### 3. *Jury Instruction on Adverse Employment Action*

■ The AF also challenges the Court's Instruction No. 18 on adverse employment action as a basis for a new trial. More specifically, the AF contends that the Court erred in instructing the jury that "[s]everal employer actions, taken together, may be considered in determining whether there has been an adverse employment action." Mot. at 17. There are several problems with the AF's argument.

First, and most important, Instruction No. 18 was part of the Court's instructions on the disparate treatment claim on which the AF prevailed, not the hostile work environment claim. The Court's instruction on adverse tangible employment action—applicable to the hostile work environment claims—was Instruction No. 26, and it was almost a duplicate of the Ninth Circuit Model Instruction No. 13.3. Thus, since the AF prevailed on the disparate treatment claim, there is no prejudice from Instruction No. 18.

Second, the AF's argument relies in large part on *Ray v. Henderson,* 217 F.3d 1234 (9th Cir.2000), as setting forth the appropriate standard for adverse employment action. However, in *Ray* the Ninth Circuit defined adverse employment action in the *retaliation* context, not in the disparate treatment or hostile work environment context. More specifically, the Ninth Circuit defined adverse employment action as "adverse treatment that is reasonably likely to *deter* employees from engaging in protected activity." *Id.* at 1237 (emphasis added). Clearly, this definition is tailored to a retaliation action; it has no application here as no claim of retaliation was asserted.

Third, as to the merits of the instruction, the courts which have examined the question have held that several employer actions taken together can constitute an ad-

verse employment action (for purposes of a disparate treatment claim). *See, e.g., Ford v. Gen. Motors Corp.,* 305 F.3d 545, 554 (6th Cir.2002) (holding that plaintiff's increased workload, heightened scrutiny, and constructive discharge, taken together, constituted materially adverse employment action); *Simas v. First Citizens' Fed. Credit Union,* 170 F.3d 37, 50 (1st Cir. 1999) (holding that several employment actions, "viewed in the aggregate, could be considered 'materially adverse' "); *see also Hildebrandt v. Illinois Dep't of Natural Resources,* 347 F.3d 1014, 1034 (7th Cir. 2003) (acknowledging that "there may be situations when a difference in the frequency and quality of evaluations may constitute an adverse employment action"). The Ninth Circuit has not held to the contrary. Nor has the AF proffered any substantial reason in either law or policy why an alleged adverse action should not encompass the totality of the circumstances.

Finally, even though Instruction No. 18 discussed several employer *actions* (plural) constituting an adverse employment *action* (singular), it also clearly stated that:

> FOR CLAIM 1, AN ADVERSE EMPLOYMENT *ACTION* CONSTITUTES A SIGNIFICANT CHANGE IN EMPLOYMENT STATUS, SUCH AS FIRING, FAILING TO PROMOTE, SIGNIFICANTLY DIMINISHED MATERIAL RESPONSIBILITIES, REASSIGNMENT WITH SIGNIFICANTLY DIFFERENT RESPONSIBILITIES, UNDESIRABLE REASSIGNMENT, OR A DECISION CAUSING A SIGNIFICANT CHANGE IN BENEFITS.

Jury Instruction No. 18 (emphasis added). The jury was therefore informed that, to constitute an adverse employment action, the conduct, even considered in the aggregate, had to rise to the level of a "significant change in employment status." The

ultimate substantive burden placed upon Dr. Velez was not altered.

### C. *Remittitur*

As a preliminary matter, the Court should note that there are actually two remittitur-type arguments raised by the AF. The first is that the jury award should be reduced to $300,000, which, according to the AF, is the maximum amount that may be awarded under Title VII. The second is that the jury award should be reduced to $75,000 total, which would reflect approximately $5000 for each of the fifteen months that Dr. Velez was subject to a hostile environment (*i.e.,* from February 1995 to May 1996). Each argument is addressed below.

#### 1. *Statutory Cap*

The AF argues that this case is subject to Title VII's statutory cap of $300,000, and Dr. Velez does not make any effort to contest this argument. Indeed, Dr. Velez states in her opposition: "The only offset of the jury's award should be limited to the Title VII cap of $300,000.00 . . . ." Opp'n at 1.

The parties are correct that Title VII's statutory cap is applicable to the instant case—*i.e.,* that the federal government like any private employer has the benefit of the statutory maximum award. Title 42 U.S.C. § 1981a(b)(3) states:

> The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party—
>
> . . . .
>
> (D) in the case of a *respondent* who has more than 500 employees in each of

20 or more calendar weeks in the current or preceding calendar year, $ 300,000.

42 U.S.C. § 1981a(b)(3) (emphasis added). The word "respondent" is defined in 42 U.S.C § 2000e as "an employer, employment agency, labor organization, joint labor-management committee controlling apprenticeship or other training or retraining program, including an on-the-job training program, *or Federal entity subject to section 717.*" *Id.* § 2000e(n) (emphasis added). The Court therefore orders that the jury award should be reduced to $300,000 to reflect Title VII's statutory cap.

### 2. Remittitur to $75,000

As noted above, the AF also argues that the jury award should be reduced to a total of $75,000 because the $500,000 plus award was "vastly out of proportion with the lack of severity of the allegedly hostile work environment and clearly do not comport with the relevant fifteen (15) month time period established by this court." Mot. at 19–20. In short, the AF's argument is that the amount of the jury award is not supported by the evidence.

Moore's treatise explains, that, if a court believes that a verdict is excessive,

> it may overturn the verdict and order a new trial outright, or [it] may order a new trial conditioned on the verdict winner's refusal to accept a "remittitur." Remittitur is defined as the process by which a court compels a plaintiff to choose between the reduction of an excessive verdict and a new trial. If the plaintiff rejects the specified reduction in the amount of damages, the court must grant a new trial; the court does not have the option of entering judgment for the reduced amount without the plaintiff's consent.

Moore's Fed. Practice § 59.13; *see also* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Practice & Proc. § 2815 ("Except in those cases in which it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been there, the court may not arbitrarily reduce the amount of damages, for to do so would deprive the parties of their constitutional right to a jury.").[5]

Given the reduction of the jury award to $300,000, to reflect the statutory cap, the

---

**5.** For cases indicating the same, see *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1396 (6th Cir.1990) ("[E]ven if remittitur had been appropriate here, a forced remittitur without the offer of the option of a new trial constitutes error, requiring this court to reverse and reinstate the verdict."); *Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir.1995) ("It is not among the powers of the trial court, where the jury has awarded excessive damages, simply to reduce the damages without offering the prevailing party the option of a new trial."); *Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 305 n. 2 (4th Cir.1998) ("[W]e are mindful that our options in remedying an excessive verdict are not unlimited.... [F]or purposes of avoiding conflict with the Seventh Amendment, the preferable course, upon identifying a jury's award as excessive, is to grant a new trial nisi remittitur, which gives the plaintiff the option of accepting the remittitur or of submitting to a new trial."); *Johan-*

*sen v. Combustion Eng'g., Inc.*, 170 F.3d 1320, 1328–29 (11th Cir.1999) (noting that, as a general matter, "[a] federal court has no general authority to reduce the amount of a jury's verdict" because "[t]he Seventh Amendment prohibits re-examination of a jury's determination of the facts, which includes its assessment of the extent of plaintiff's injury" but adding that a district court may order a new trial—although "[t]he Seventh Amendment requires ... that the plaintiff be given the option of a new trial in lieu of remitting a portion of the jury's award"); *Waits v. City of Chicago*, No. 01 C 4010, 2003 WL 21310277, *7, 2003 U.S. Dist. LEXIS 9448, at *21–22 (N.D.Ill. June 6, 2003) ( "The Court is mindful that it may not arbitrarily reduce plaintiff's punitive damage award. Rather, the proper procedure is to give the plaintiff the choice of either accepting the remittitur, or of rejecting the remittitur and forcing a new trial limited solely on the issue of punitive damages.").

question for the Court is whether an award of $300,000 for emotional distress is excessive. The Ninth Circuit has held that a jury's finding on the amount of damages should be reversed only if the amount is "grossly excessive or monstrous," *Zhang v. American Gem Seafoods, Inc.,* 339 F.3d 1020, 1040 (9th Cir.2003) (internal quotation marks omitted), or if the amount is "clearly unsupported by the evidence" or "shocking to the conscience." *Brady v. Gebbie,* 859 F.2d 1543, 1557 (9th Cir.1988) (internal quotation marks omitted).

In making this determination, the Court must focus on evidence of the qualitative harm suffered by Dr. Velez, and not simply on the severity or pervasiveness of the conduct constituting the harassment. *See, e.g., Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 513–14 (9th Cir.2000) (focusing on evidence of harm suffered by plaintiff, *e.g.,* anxiety, rashes, etc.); *see also Peyton v. DiMario,* 287 F.3d 1121, 1128 (D.C.Cir.2002) ("[T]o the extent that the egregiousness of GPO's conduct was considered, it was merely as a proxy to assess the distress inflicted upon Peyton."). The severity or pervasiveness of the conduct is relevant insofar as it provides probative evidence from which a jury may infer the nature and degree of emotional injury suffered, but direct evidence of the injury is still the primary proof.

▪ The Court must also bear in mind that "awards for pain and suffering are highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated in economic terms." *Baker v. John Morrell & Co.,* 266 F.Supp.2d 909, 944 (N.D.Iowa 2003); *see also Fox v. GMC,* 247 F.3d 169, 180 (4th Cir.2001) (noting that "[c]ourts defer to a jury's award of damages for intangible harms, such as emotional distress, 'because the harm is subjective and

evaluating it depends considerably on the demeanor of the witnesses' ").

Finally, the Court takes guidance from the Ninth Circuit that substantial emotional distress damages awards need not be supported by "objective" evidence and that the subjective testimony of the plaintiff, corroborated by others (including relatives), may be sufficient. *See Passantino,* 212 F.3d at 513–14 (noting that case law in Washington state, Ninth Circuit, and Supreme Court does not require emotional distress damages awards to be supported by "objective" evidence and that, in this case, plaintiff's claims of distress were corroborated by husband and sister); *see also Zhang,* 339 F.3d at 1040 (in § 1981 case, stating that plaintiff's "testimony alone is enough to substantiate the jury's award of emotional distress damages," which court estimated could be more than $200,000).

In the instant case, the evidence of the qualitative harm suffered by Dr. Velez consisted largely of Dr. Velez's own testimony and the testimony of her husband Michael Remler. Dr. Velez testified that, as a result of the gender discrimination, she cried every time she got close to the DGMC and that she used to be a high energy person but that she became so depressed that she could not sleep, that she had no interest in doing anything, that she stopped activities and hobbies such as working out, gardening, painting, doing things with her children, and that she could barely get one thing done. Dr. Velez also testified that she felt betrayed and lied to by her AF colleagues and that her reputation suffered injury. Dr. Velez acknowledged that she did not seek the help of a counselor, therapist, or clergyperson but that was in large part due to the fact that she got counsel and assistance from her husband, a neurologist. Dr. Remler testified that Dr. Velez suffered from clinical depression for which he counseled her

and continues to counsel her to the present. He also testified about the change in Dr. Velez's attitude, from a strong independent woman to one who completely broke down, including sudden outbursts into tears, and from a person with vitality and energy into one without interest in the activities and hobbies she loved to do.

The AF does not challenge any of the above evidence, with the exception of the evidence about injury to Dr. Velez's reputation. The AF argues in essence that this evidence should not be considered at all because any adverse effect of the abeyance was relevant only to the disparate treatment claim on which the AF prevailed and Dr. Velez lost. The Court recognizes that the AF did prevail on the disparate treatment claim and moreover that the jury did not award Dr. Velez any economic damages (*e.g.*, loss of future economic opportunities). However, as discussed above, the jury legitimately could have thought that the abeyance—as well as the multiple critical reviews to which Dr. Velez was subjected and the numerous comments made about the alleged incompetence of Dr. Velez and Dr. Zulim—contributed to the hostile work environment even if it ultimately concluded the abeyance was not in fact reportable. Thus, the jury could have concluded that Dr. Velez's perception of grievous injury to her reputation and the risk of the abeyance being reportable contributed to her emotional distress. *Cf. Passantino*, 212 F.3d at 513 (stating that jury could have found that plaintiff suffered substantial emotional damage because of defendant's retaliation against her; noting that plaintiff "testified, and her husband and sister corroborated, that she experienced substantial anxiety as a result of her sense that she could no longer advance within the company"); *see also Zhang*, 339 F.3d at 1040–41 (in § 1981 case, discussing emotional distress to plaintiff, worth more than $200,000, in terms of hurt and humiliation

to plaintiff in part because his reputation was impugned).

The Court must now address whether an award of $300,000 is excessive in light of the noneconomic damages suffered by Dr. Velez as described above. "In determining whether a jury award for compensatory damages is excessive, a court may review awards made in similar cases to determine whether or not an award is excessive and calls for an order of remittitur." *Thornton v. Kaplan*, 958 F.Supp. 502, 505 (D.Colo.1996). This approach, of course, is not without difficulty as recognized by even the *Thornton* court. *See id.* ("[B]ecause courts have upheld or set aside jury verdicts in significantly differing amounts and in significantly different circumstances[,] [i]nvariably, one could find a case to support nearly any award of damages in nearly any amount."); *Peyton*, 287 F.3d at 1127 (quoting a state court case which noted that, " '[b]ecause of the unique circumstances of each case as well as the adjustments which would necessarily have to be made for inflation, it is awkward to discuss the size of an award through comparison with past decisions' "). However, while recognizing that there are problems with comparing jury awards, comparable cases provide a rough benchmark.

Dr. Velez has cited several cases in which plaintiffs have been awarded similar amounts. *See, e.g., Peyton* at 1126–28 (noting that jury awarded the plaintiff $482,000 in compensatory damages on claims of hostile work environment and retaliation; upholding the award (after it had been reduced to reflect the statutory cap) because there was evidence that the discrimination had a material effect on plaintiff's ability to perform and that the plaintiff was distressed and fearful about her work environment); *Hogan v. Bangor & Aroostook R.R. Co.*, 61 F.3d 1034, 1037–

38 (1st Cir.1995) (noting that jury awarded the plaintiff $200,000 in compensatory damages on ADA claim; upholding the award because there was evidence that the plaintiff became depressed and withdrawn, gave up his usual activities, and was put in a difficult financial situation); *Wilmington v. J.I. Case Co.*, 793 F.2d 909, 922 (8th Cir.1986) (noting that jury awarded the plaintiff $400,000 in compensatory damages on disparate treatment claim; upholding the award because there was evidence that the plaintiff suffered a deterioration in his health, mental anxiety, humiliation, and emotional distress as well as evidence that the plaintiff was not able to find a new job after being discharged); *Passantino*, 212 F.3d at 513 (noting that jury awarded $1,000,000 in compensatory emotional distress damages for retaliation claim; upholding the award (allocated to the state claim) because there was evidence that the plaintiff suffered anxiety as well as physical ailments such as rashes and stomach problems); *Zhang*, 339 F.3d at 1040–41 (in § 1981 case, discussing emotional distress to plaintiff, worth more than $200,000, in terms of hurt and humiliation to plaintiff).

 While the cases above are distinguishable from the instant case in certain respects with respect to the qualitative harm suffered (*e.g.*, in *Hogan*, the plaintiff had a drop in income and, in *Peyton*, the plaintiff might have been fearful of the work environment because of a physical assault and threats), the cases still demonstrate that substantial jury awards of hundreds of thousands of dollars for non-economic damages have been upheld where there is evidence, as there was in the instant case, that the plaintiff suffered heightened mental anguish—in this case, depression and a significant change in outlook and inability to engage in prior activities. Notably, the AF has not pointed the Court to any cases in which a substantial

jury award for emotional distress damages was overturned.

While Dr. Velez did cite one case in which an award was overturned, *see Hetzel v. County of Prince William*, 89 F.3d 169 (4th Cir.1996), that case is distinguishable from the instant case. Most notably, in *Hetzel*, "[t]he evidence presented at trial concerning [plaintiff's] emotional distress consisted almost exclusively of [her] own brief, conclusory statements .... [Plaintiff] presented no evidence corroborating the existence of any of her supposed specific harms." *Id.* at 171. In contrast, in the instant case, Dr. Velez's testimony about her emotional distress was not cursory. She explained, for example, how she was very depressed, that she felt betrayed and lied to, and that while she used to have a high energy level she could barely get anything done and stopped participating in activities because she was emotionally exhausted. Moreover, her husband, Dr. Remler, testified at length about Dr. Velez's mental anguish that resulted from the events at the DGMC. As noted above, he stated that, previously, Dr. Velez was an independent, strong woman who always found a way to "dig deeper" to tackle her problems but that, after the events at the DGMC, she was not able to so and instead broke down and turned to him for support, something that she had never done before. He also stated that Dr. Velez would even burst into tears at times when reminded of what happened at the DGMC. Dr. Remler further testified that Dr. Velez lost vitality and energy after the events at the DGMC and no longer participated in activities that used to engage her; further, her outlook on life changed significantly. He testified as well that Dr. Velez suffered clinical depression for which he counseled her and continues to counsel her to this day. In any event, the Ninth Circuit has expressed disagreement with the Fourth Circuit's approach in *Hetzel*. *See Passantino*, 212 F.3d at 514.

To be sure, the jury could have reasonably awarded Dr. Velez less than $300,000 because she did not formally consult a doctor or seek counsel for her depression (other than her husband), did not take any medication for her mental condition, and continued to work at the DGMC. The Court also recognizes that there are cases in which plaintiffs have been awarded less in spite of evidence of depression and the like. *See, e.g., EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1285 (7th Cir. 1995) (upholding $ 50,000 awarded to the plaintiff where plaintiff and his family testified that he suffered from depression, rage, and fear resulting from his sudden firing). However, the fact that the jury could have awarded less and that in many, if not most, instances juries have awarded less does not necessarily dictate the propriety of a remittitur. *See id.* (noting that the plaintiff may not have deserved an award of $50,000 but stating that "that is not the question"; rather "[t]he question is whether that award was grossly excessive"). If Dr. Velez suffered nothing more than "garden variety" emotional distress, the AF's request for remittitur would be more compelling. Viewed in Dr. Velez's favor, however, the evidence presented was more than garden variety distress. *See, e.g., Reiter v. Metro. Transp. Auth. of N.Y.*, No. 01 Civ. 2762(JGK), 2003 WL 22271223, *9, 2003 U.S. Dist. LEXIS 17391, at *26 (S.D.N.Y. Sept. 30, 2003) (stating that, in garden variety emotional distress cases, "the evidence usually is limited to the testimony of the plaintiff, who describes the emotional distress in vague or conclusory terms, presents minimal or

no evidence of medical treatment, and offers little detail of the duration, severity, or consequences of the condition"). Dr. Velez's testimony about her pain and suffering was specific and corroborated by that of her husband, a doctor who counseled her and continues to counsel her for clinical depression.

For the reasons stated above, there was evidence of distress was substantial and not out of line with other cases upholding substantial awards of similar magnitude. Although a jury could have properly awarded less, the Court cannot say that the adjusted award of $300,000 is "monstrous," "shocking to the conscience," or "clearly unsupported by the evidence."

### D. Offset

The AF also contends that the jury award should be reduced because of Dr. Velez's settlement with the VA; in other words, according to the AF, it should be entitled to an offset.[6] *See* D's Mot. at 20 (noting that Dr. Velez received 1,365 hours of sabbatical leave under settlement with VA—which, according to AF's expert, has a minimum value of $105,442—as well as $29,000 in attorney's fees). The thrust of the AF's argument is that it is inconsistent for Dr. Velez to argue that the AF and VA were joint employers but that the two were not jointly liable for the discrimination at the DGMC. *See* Reply at 14–15.

As a preliminary matter, the Court notes that the AF has not cited any authority requiring an offset under Title VII in the context of an assertion of such by a nonsettling defendant where another defendant previously settled.[7] Assuming

---

6. The Court issued an order regarding admissibility of the VA settlement, which can be located at Docket No. 180 (order of 1/30/04).

7. Given that one of the purposes of Title VII is to provide an opportunity for parties to reach a voluntary settlement of an employment discrimination dispute, *see Blank v. Donovan*,

780 F.2d 808, 809 (9th Cir.1986), there are policy considerations that arguably counsel against applying an offset rule in Title VII cases, even though this might result in duplicate recovery to the plaintiff. *Cf. Banks v. Yokemick*, 177 F.Supp.2d 239, 262 (S.D.N.Y. 2001) (in § 1983 case, stating that pro tanto

arguendo that Title VII afford such an offset, the AF has the burden of demonstrating its entitlement to the offset.[8] *Cf. Ruhlmann v. Smith*, 323 F.Supp.2d 356, 368–69 (N.D.N.Y.2004) (in § 1983 case, noting that defendants had burden of proving set-off; ultimately holding that complete set-off was not appropriate because of "the lack of definitive proof offered by defendants" but allowing partial set-off "because of the *certainty* that most of the settling defendants were involved—some perhaps intimately—in the claims for which the jury rendered its verdict at trial") (emphasis added); *Banks*, 177 F.Supp.2d at 265 (in § 1983 case, stating that "the issue of setoff is an affirmative defense" such that defendant had the burden of proof); *see also Gaworski v. ITT Commercial Fin. Corp.*, 17 F.3d 1104, 1111–12 (8th Cir.1994) (in ADEA case, noting that defendant had burden of proving that plaintiff "might have found comparable employment, the earnings of which would offset any damages awarded"); *Donnelly v. Yellow Freight System, Inc.*, 874 F.2d 402, 411 (7th Cir.1989) (in Title VII case, stating that employer bears burden of proving plaintiff's failure to mitigate damages); *Di Salvo v. Chamber of Commerce*, 568 F.2d 593, 598 (8th Cir.1978) (in discussing back pay under 42 U.S.C. § 2000e–5, stating that, "[o]nce plaintiff in a Title VII case ... has proven her case and established what she contends to be her damages, the burden of going forth to mitigate the liability or to rebut the damage claim rests with the defendant").

■ A nonsettling defendant may claim an offset for amounts paid in settlement by other defendants only if two conditions are met. First, the nonsettling defendant must demonstrate that the settlement and award (against which the offset is sought) were for the same injury. *See Getty Petroleum Corp. v. Island Transp. Corp.*, 862 F.2d 10, 15 (2d Cir. 1988) (in trademark infringement case, upholding district court's decision not to offset because nonsettling defendants failed to establish that payments made to plaintiff by settling defendants were for same injury); *Banks*, 177 F.Supp.2d at 264 (S.D.N.Y.2001) (in § 1983 case, stating that, for set-off rule to apply, "whether state or federal, the settlement must be predicated on the tortfeasors' liability for damages attributable to on the same injury"). Second, the injury must be indivisible such that there is joint and several liability among the settling and nonsettling defendants. *See Goad v. Macon County*, 730 F.Supp. 1425, 1426 (M.D.Tenn.1989) (in § 1983 case, stating that, "if the claims against the settling defendants were separate and distinct claims from the trial defendants, the losing trial defendants cannot call for a set-off"); *Hoffman v. McNamara*, 688 F.Supp. 830, 831 (D.Conn.1988) (in § 1983 case, stating that, when plaintiff's injuries are divisible among several defendants, there can be no claim of contribution or set-off); *cf.* Rest. (2d) of Torts § 433A (stating that damages for harm are to be apportioned among two or more causes where "there are distinct harms" or "there is a reasonable basis for determining the contribution of each cause to a single harm").

■ The AF has failed to meet its burden on both elements. First, it has not

---

set-off rule—*i.e.*, dollar-for-dollar reduction—works against policy end of promoting settlement).

8. Offsets have been permitted in reducing awards against nonsettling defendants under 42 U.S.C. § 1983. *See, e.g., Ruhlmann*, 323 F.Supp.2d at 368–69 (in § 1983 case, permitting partial set-off).

demonstrated that Dr. Velez's settlement of her administrative claim with the VA was for the *same injury* for which she was awarded judgment against the AF at trial. Although the recital in the Settlement Agreement refers to the two administrative complaints against the VA and AF for events that took place at the DGMC. in 1995, it also refers to a third EEOC complaint against the VA for totally different events that took place in 1997, including allegations of unfair treatment from March to June 1997 and retaliation by the VA. *See* Lee Decl. ¶ 2 & Ex. A (EEO complaint against VA for 1997 events). The Settlement Agreement specifically states that it does not settle or effect any claims Dr. Velez had against the AF.

Not only is there no indication in the Settlement Agreement that the settlement paid by the VA was for conduct of AF staff (for which the VA could have been liable under certain theories), as opposed to VA conduct, there is no indication that the settlement was paid for the emotional distress stemming from the hostile work environment as opposed to the claimed economic injury resulting from Dr. Velez's abeyance, a major focus of her suit.

Furthermore, the documentary evidence suggests that the "compensation" paid in the VA settlement, 1,365 hours of administrative leave representing ninth months of leave at ⅞ full-time employment ("FTE") equivalent, was responsive to Dr. Velez's demand contained in the December 18, 1998, letter from her counsel to the VA's regional counsel seeking parity with other VA employees. *See* Lee Decl., Ex. D (letter of 12/18/98 from Lee to Hansen). In that letter, Dr. Velez sought twelve months of leave at ⅞ FTE for educational purposes because certain other VA employees had received substantive sabbatical leaves for educational or recreational purposes. The Settlement Agreement grants nine months of leave "in support of

the educational goals" Dr. Velez was undertaking during her sabbatical leave. Lee Decl., Ex. C, at 2 (VA settlement agreement).

As to the second element, the AF has failed to prove that, even if the settlement was for injury suffered by Dr. Velez at the DGMC in 1995, that injury was *indivisible* such that the VA and AF would be jointly liable. The claim of employer liability for hostile working environment under Title VII turns on several alternative legal theories and a matrix of evidence relevant thereto; it depends upon, *e.g.*, whether the harasser is a co-worker or supervisor, whether there was a tangible adverse employment action, and the extent of the employer's knowledge and adequacy of its response. As to each the AF and VA, the matrix of applicable factors could differ, and the extent of their respective liabilities to Dr. Velez are not necessarily co-extensive. Thus, this case differs from the situation where the role of settling defendant is indistinguishable from that of the trial defendant. *Cf. Goad,* 730 F.Supp. at 1432 (stating that examination of complaint and pretrial order revealed that plaintiff was pursuing a joint liability theory against all the defendants; "[a]ll defendants were lumped together in the charge of unreasonable force as well as the charge of denial of medical attention" and "[n]othing indicated that separate claims were being asserted against the settling defendants").

The AF relies on the fact that Dr. Velez asserts the AF and VA were joint employers and thus must be jointly liable. However, the argument is a non-sequitur both legally and factually. First, even where defendants are joint employers, joint liability does not. necessarily lie where liability turns, *e.g.*, upon each employer's knowledge and action. *Cf. America's Best Quality Coatings Corp. v. NLRB,* 44 F.3d 516, 523 (7th Cir.1995) (in NLRA case, agreeing that, "although Staff Right and ABQC

were joint employers, Staff Right neither knew nor should have known of the improper conduct and therefore is not jointly liable"). As noted above, that is the case here given the variousness of employer liability under Title VII.

Second, the AF's liability at trial was not predicated solely on a joint employer determination. As discussed above, the AF could well have been found liable as an indirect employer under *Gomez* and *Sibley*, a basis of liability wholly distinct from the assertion of direct employer liability presumably asserted against the VA.

Finally, it is significant that the jury in this case was instructed to award damages only for the conduct attributable to the AF. *See Dowd v. United Steelworkers of Am., Local No. 286,* 253 F.3d 1093, 1103–04 (8th Cir.2001) (in Title VII case, rejecting union's argument that jury awarded damages for emotional distress plaintiffs suffered as consequence of events that union and employer jointly caused or permitted to happen and that union, as nonsettling defendant, was entitled to have amount it owed set off by settlement amount paid by employer; noting that "jury was instructed to render a damages judgment based solely upon what the jury determined to be the union's conduct"); *cf. Wren v. Spurlock,* 798 F.2d 1313, 1323 (10th Cir.1986) (in § 1983 case, noting that court instructed jury on necessity of finding nonsettling defendant's conduct to be proximate cause of plaintiff's injuries); *Getty,* 862 F.2d at 16 (in trademark infringement case, stating that, "[b]ecause the jury's compensatory award did not take into account plaintiff's injuries attributable to the settling codefendants, [defen-

dants] may not ... decrease their liability for compensatory damages by virtue of these settlements"). This fact greatly diminishes the probability that the verdict award was for the same injury and conduct that was settled in the VA settlement.

Accordingly, even if a set-off were available under Title VII, the AF has failed to establish its entitlement to the set-off.[9]

### E. *Injunctive Relief*

■ Previously, the Court deferred ruling on Dr. Velez's request for placement of a notice about the jury's verdict in her AF personnel file. The Court stated that it was inclined to grant the relief and instructed the parties to meet and confer to discuss, *inter alia,* what files the AF actually maintains with respect to Dr. Velez (*e.g.,* credentials file, quality assurance file). Subsequently, the parties submitted letters discussing the results of their meet and confer but, notably, in her letter, Dr. Velez changed the nature of her request for injunctive relief. "Rather than placing jury verdict forms or verdict summaries in all the different files which might exist and monitor their maintenance, plaintiff requested a letter from the Air Force's legal counsel confirming ... [t]hat an abeyance is not an adverse clinical action on her credentials, and ... [t]hat an abeyance is not a reportable incident under its procedures." Letter from J. Lee to Court of 4/9/04, at 2.

While the Court was inclined to grant Dr. Velez's request for injunctive relief when the relief she sought was the inclusion of the jury verdict in the relevant AF file, the relief she now seeks is not appro-

---

9. Neither party asserts that the AF's entitlement to an offset is a matter that must be tried to a jury. At least one court has held that the matter is for a judge to determine. *See Smith v. Sheahan,* No. 95 C 7203, 2000 WL 765089, *5, 2000 U.S. Dist. LEXIS 8140, at *15 (N.D.Ill. June 12, 2000) (stating that,

"[t]o the extent defendant is entitled to an offset [because plaintiff got workers' compensation for a wrist injury caused by a coworker, part of the alleged hostile work environment], that would also be an issue for a separate action or the court, not the jury trying plaintiff's Title VII claim").

priate for reasons similar to those stated in the Court's order of April 2, 2004. *See* Docket No. 229 (order of 4/2/04). That is, the relief that Dr. Velez now seeks is not warranted given that the jury did not find for Dr. Velez on the gender-based disparate treatment claim and the reviews and abeyance were primarily related to this claim. Although the jury did find for Dr. Velez on the hostile work environment claim, it is not clear whether the jury determined that there was sexual harassment because of sexually offensive acts, sexually offensive statements, gender-based disparate treatment, or some combination of the three.

### III. *CONCLUSION*

For the foregoing reasons, the Court hereby DENIES the AF's motion for judgment as a matter of law or new trial, DENIES the AF's request for remittitur, DENIES the AF's request for an offset, and DENIES Dr. Velez's request for injunctive relief. The jury award is reduced, however, to $300,000 to reflect Title VII's statutory cap.

IT IS SO ORDERED.