C.B., a minor, Plaintiff,

v.

SONORA SCHOOL DISTRICT; Karen Sinclair; City of Sonora; Chief of Police Mace McIntosh; Officer Hal Prock; Does 1–10, Defendants.

No. 1:09–cv–00285–OWW–SMS.

United States District Court,
E.D. California.

Sept. 30, 2011.

Order Denying Stay Oct. 28, 2011.

John F. Martin, Christine Ann Hopkins, Law Offices of John F. Martin, A Professional Corporation, Walnut Creek, CA, for Plaintiff.

Cornelius John Callahan, Borton Petrini, LLP, Modesto, CA, Joy C. Rosenquist, Goyette & Associates, Inc., Gold River, CA, for Defendants.

MEMORANDUM DECISION RE DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR NEW TRIAL AND REMITTITUR

OLIVER W. WANGER, District Judge.

## I. *INTRODUCTION*

Before the court are Defendants City of Sonora, Chief Mace McIntosh and Officer Hal Prock's (collectively, "Defendants"), (1) Motion for Judgment as a Matter of Law (Defs. Mot. JMOL, ECF No. 177) and (2) Motion for New Trial and Remittitur (Defs. Mot. NT, ECF No. 178). Plaintiff C.B., a minor, ("Plaintiff") opposes both motions. (Pl. Opp'n JMOL, ECF No. 186; Pl. Opp'n NT, ECF No. 188.)

## II. *FACTUAL BACKGROUND*

This civil rights action arises from Officers McIntosh and Prock's (together, "Defendant Officers") September 29, 2008 arrest of Plaintiff, then an eleven year old student, at Sonora Elementary School. Plaintiff filed a Complaint (Compl., ECF No. 2) and an Amended Complaint (Am. Compl., ECF No. 54) alleging: (1) violation of the Unruh Civil Rights Act; (2) false imprisonment; (3) battery; (4) intentional infliction of emotional distress; (5) violation of Section 504 of the Rehabilitation Act of 1973; (6) violation of the Americans with Disabilities Act; and (7) civil rights claims under 42 U.S.C. § 1983 pursuant to the Fourth Amendment. Plaintiff settled his claims against Defendants Sonora School District ("School District") and Karen Sinclair on November 6, 2009. (Pet. Approval of Compr., ECF No. 48.)

The case was tried before a jury beginning on August 23, 2011. On August 31, 2011, the jury reached a verdict, which the court determined was inconsistent. An error in instructions on answering a question on the jury verdict form was discovered and corrected. The court answered the jury's questions and gave supplemental instructions and explanations.

On September 1, 2011, the jury reached the following verdicts: (1) Defendants violated Plaintiff's Fourth Amendment right not to have excessive force used against him, and this violation caused harm or damage to Plaintiff; (2) Defendants violated Plaintiff's Fourth Amendment rights by taking him into temporary custody and removing him from school, and this violation caused harm or damage to Plaintiff; (3) the City of Sonora has a long standing practice or custom that caused its police officers to use excessive force against juve-

niles; (4) Defendant Officers intentionally caused Plaintiff to suffer severe emotional distress, and this caused harm or damage to Plaintiff; (5) Defendant Officers did not have a legal right to take Plaintiff into temporary custody and to use reasonable force to effectuate and continue that custody; (6) Defendant Officers wrongfully took Plaintiff into temporary custody and/or wrongfully retained him in custody, and this caused harm or damage to Plaintiff; (7) Defendant Officers did not have probable cause to take Plaintiff into temporary custody and/or continue to hold him in temporary custody; and (8) Defendant Officers acted with malice, oppression, or reckless disregard of Plaintiffs' rights. (Verdict, ECF No. 174.) The jury awarded Plaintiff the following damages against Defendants:

| CLAIM | OFFICER MCINTOSH | OFFICER PROCK | CITY OF SONORA |
|---|---|---|---|
| 4th Amend. Excessive Force | $ 15,000 | $ 5,000 | $ 50,000 |
| 4th Amend. Seizure | $ 15,000 | $ 5,000 | $ 50,000 |
| Intentional Infliction Emotional Distress | $ 75,000 | $50,000 | — |
| False Arrest | $ 15,000 | $ 5,000 | — |
| Punitive Damages | $ 0 | $ 0 | — |
| **TOTAL** | **$120,000** | **$65,000** | **$100,000** |

(Verdict 12–13, 16, ECF No. 174.)

### III. *MOTION FOR JUDGMENT AS A MATTER OF LAW*

Defendants move for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 on all of Plaintiff's causes of actions and Defendants' affirmative defenses. Plaintiff contends that Defendants' motion fails because the "overwhelming weight of the evidence supports the jury verdicts against Defendants ...." (Pl. Opp'n JMOL 6, ECF No. 186.)

#### A. *Legal Standard*

 Federal Rule of Civil Procedure 50 governs motions for judgment as a matter of law in jury trials, and "allows the trial court to remove cases or issues from the jury's consideration 'when the facts are sufficiently clear that the law requires a particular result.'" *Weisgram v. Marley Co.*, 528 U.S. 440, 447–48, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000) (quoting 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2521 (2d ed.1995)). Rule 50(a) provides in pertinent part:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed.R.Civ.P. 50(a)(1).

 "A district court may set aside a jury verdict and grant judgment as a matter of law 'only if, under the governing law, there can be but one reasonable conclusion as to the verdict.'" *Settlegoode v. Portland Pub. Schs.*, 362 F.3d 1118, 1122 (9th Cir.2004) (quoting *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir.2001)). "[T]he court must

draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). "A judgment as a matter of law may be granted only if the evidence, viewed from the perspective most favorable to the nonmovant, is so one-sided that the movant is plainly entitled to judgment, for reasonable minds could not differ as to the outcome." *Gibson v. City of Cranston*, 37 F.3d 731, 735 (1st Cir.1994).

## B. *Discussion*
### 1. *Plaintiff's Fourth Amendment Claims*
#### a) *Unlawful Seizure*

Defendants move for judgment as a matter of law on Plaintiff's unlawful seizure claim on the grounds of qualified immunity. Defendants contend that a reasonable officer in Defendant Officers' shoes during the incident would know that they were authorized to take Plaintiff into custody under Welfare and Institutions Code §§ 625 and 601 because Plaintiff was "beyond the control" of his guardian.

■ Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The qualified immunity inquiry has two prongs: (1) "whether the facts that a plaintiff has alleged · . . . or shown . . . make out a violation of a constitutional right," and (2) "whether the right at issue was clearly established' at the time of defendant's alleged misconduct." *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir.2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 129

S.Ct. 808, 815–816, 172 L.Ed.2d 565 (2009)).

### (1) *Constitutional Violation*

■ Defendants contend that the "special needs" standard applies to Plaintiff's Fourth Amendment claim for unlawful seizure. Traditional Fourth Amendment protections are lowered "when special needs, beyond the normal need for law enforcement, make the warrant and probable cause requirement impracticable." *Greene, v. Camreta*, 588 F.3d 1011, 1026, 1030 (9th Cir.2009), vacated in part on other grounds by *Camreta v. Greene*, —— U.S. ——, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987)). Defendants, however, do not specify what "special needs" are present in this case beyond the normal need for law enforcement to respond to a call for services from the school. Drawing all inferences in favor of Plaintiff, as required under this motion for judgment as a matter of law, there is insufficient evidence to satisfy Defendant's burden on the threshold question of the applicability of the "special needs" standard.

■ The Fourth Amendment protects students from unreasonable seizures at school. *See, e.g., New Jersey v. T.L.O.*, 469 U.S. 325, 333, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). A police officer's seizure of a student at a school is generally subject to traditional Fourth Amendment analysis when done for traditional law enforcement purposes. *See Greene*, 588 F.3d at 1026 (holding that the *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), standard does not apply to seizure of student at school where child was not seized for a "special need" beyond the normal need for law enforcement). To comply with the Fourth Amendment, a warrantless arrest must be

supported by probable cause. *Krainski v. Nev. ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.,* 616 F.3d 963, 969 (9th Cir. 2010). "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez,* 482 F.3d 1067, 1072 (9th Cir.2007). Probable cause is an objective standard. *Devenpeck v. Alford,* 543 U.S. 146, 153–55, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004). The arresting officer's subjective intention is immaterial in judging whether their actions were reasonable for Fourth Amendment purposes. *Id.*

Jury Instructions No. 14 and 15 properly instructed the jury on the elements of Plaintiff's Fourth Amendment Claim for wrongful seizure. (Jury Instructions 16–17, ECF No. 172.) The jury concluded that Defendants violated Plaintiff's Fourth Amendment rights by taking him into temporary custody and removing him from school in handcuffs, and this violation caused harm or damage to Plaintiff. (Verdict 4–5, ECF No. 174.) The evidence presented at trial, viewed in Plaintiff's favor, does not warrant setting aside the jury's verdict and granting Defendants judgment as a matter of law.

Defendant Officers received a dispatch regarding a call from the elementary school about an out of control juvenile. (Prock Test. 59:13–16, August 23, 2011.) Officer Prock testified that he could not determine based on that dispatch whether he would be justified to handcuff or arrest the juvenile involved. (Prock Test. 60:3–10.) Officer Prock testified that in his experience as a law enforcement officer, dispatches are not always accurate, and the initial step in responding to any dispatch is to arrive at the scene and investigate. (Prock Test. 60:11–17.) Officer Prock first learned that the school had not made any attempt to contact the juvenile's parents or guardians. (Prock Test. 61:23–25, 62:1–10.)

When they arrived, Defendant Officers observed that Plaintiff was seated quietly on a bench in the school's playground and was not out of control. (Prock Test. 63:17–25, 65:16–18; McIntosh Test. 42:10–18, 47:2–16, August 24, 2011.) Officer Prock testified that the only information he obtained from Coach Sinclair was that Plaintiff was a "runner," but he did not ask her what that meant. (Prock Test. 64:3–7.) Officer Prock did not learn any information about what Plaintiff had been doing prior to his arrival. (Prock Test. 65:12–15.) Chief McIntosh testified that Coach Sinclair told him that Plaintiff was a runner, was out of control, had not taken his medications, and was yelling and cussing. (McIntosh Test. 41:22–42:2, 43:20–44:8.)

Defendant Officers testified that they did not believe Plaintiff was in possession of any weapons, nor was he under the influence of any illegal drugs, nor had he committed any crime that day. (Prock Test. 69:18–23; McIntosh Test. 49:1–15.) Plaintiff did not say a word the entire time Chief McIntosh was with him. (McIntosh Test. 47:2–7.) Prior to handcuffing Plaintiff, Officer Prock did not ask the school staff if they could call a relative to pick up Plaintiff or handle the matter themselves. (Prock Test. 71:20–72:1.) The school had a protocol and plan for responding to disruptive behavior by Plaintiff. It was not followed.

█ Defendants did not provide sufficient evidence to establish, as a matter of law, that Defendant Officers' seizure of Plaintiff was reasonable under traditional Fourth Amendment standards. Defendant Officers did not have a warrant, had no probable cause to believe a crime had been committed, observed no threat to anyone's safety, and were not faced with exigent

circumstances. Defendant Officers also do not establish the lawfulness of their conduct under the lesser reasonableness standard applicable to "special needs" cases, as discussed below.

### (2) Qualified Immunity

 Government officials are generally shielded from liability for civil damages insofar as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Bryan v. MacPherson*, 630 F.3d 805, 832 (9th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Even if an officer is mistaken that probable cause to arrest existed, they are nonetheless immune from liability if their mistake is reasonable. *Krainski*, 616 F.3d at 969.

Defendant Officers contend that they are entitled to qualified immunity because California Welfare and Institutions Code §§ 625 and 601 authorizes officers to take a juvenile into temporary custody if the juvenile is beyond the control of the guardian, and Defendant Officers acted in reasonable compliance with the law. Defendant Officers also contend that they acted within proper police procedures and the policy of their department.

California Welfare and Institutions Code § 625(a) permits officers to take a minor into temporary custody without a warrant who the officer believes is a person described in Section 601, i.e.:

> Any person under the age of 18 years who persistently or habitually refuses to obey the reasonable and proper orders or directions of his or her parents, guardian, or custodian, or who is beyond the control of that person, or who is under the age of 18 years when he or she violated any ordinance of any city or county of this state establishing a curfew based solely on age is within the juris-

diction of the juvenile court which may adjudge the minor to be a ward of the court.

Cal. Wel. & Inst.Code § 601(a). California courts have interpreted Section 601(a) to require serious behavior to find a juvenile "beyond the control" of his or her parents, guardians, or custodian. *E.g., In re David S.*, 12 Cal.App.3d 1124, 1128, 91 Cal.Rptr. 261 (1970) (affirming the juvenile court's conclusion that a fourteen year old minor who deliberately lied to his mother to obtain permission to spend a weekend on Stinson Beach, forty miles away from his home in Suisun, and was picked up in San Diego, six hundred miles away from his home, was beyond the control of his parents); *In re D.J.B.*, 18 Cal.App.3d 782, 786, 96 Cal.Rptr. 146 (1971) (finding a single instance of leaving home without permission insufficient to constitute "beyond the control").

 The Memorandum Decision denying Defendants' motion for summary judgment explains that at the time of Defendants' conduct in 2008, it was not clearly established that a police officer's in-school seizure of a student in connection with a school administrator's request for assistance with an unruly student was subject to the same Fourth Amendment standards applicable outside the school context. *See Greene*, 588 F.3d at 1031 (applying special needs analysis for purposes of ascertaining qualified immunity). Defendants are entitled to qualified immunity unless their conduct was clearly unconstitutional under the lesser "special needs" reasonableness standard. *Id.* The lesser standard of reasonableness applicable in "special needs" cases requires a two part inquiry: (1) the court must consider whether the action was justified at its inception; and (2) the court considers whether the action was reasonably related in scope to the circumstances which justified the interference in

the first place. *Id.* (citing *T.L.O.,* 469 U.S. at 341, 105 S.Ct. 733).

Jury Instruction No. 15 properly instructed the jury on the "special needs" standard and on the relevant California Welfare & Institutions Code sections. (Jury Instructions 17–18, ECF No. 172.) After reading the "special needs" standard, the jury concluded that Defendants violated Plaintiff's Fourth Amendment right to be free from unlawful seizure. Drawing all inferences in Plaintiff's favor, there was sufficient evidence to support the jury's verdict. The evidence presented at trial does not establish, as a matter of law, that Defendant Officers' seizure of Plaintiff was necessary or justified at its inception, or that it was reasonably related in scope to the circumstances which justified the interference in the first place.

Defendant Officers received a call about an "out of control" juvenile, and were told, without any explanation, that Plaintiff was a "runner." (Prock Test. 64:3–7.) Defendant Officers did not learn anything about what Plaintiff had been doing prior to their arrival. (Prock Test. 65:12–15.) Chief McIntosh testified that Coach Sinclair told him that Plaintiff was a runner, was out of control, had not taken his medications, and was yelling and cussing. (McIntosh Test. 41:22–42:2, 43:20–44:8.) Defendant Officers testified that they did not believe Plaintiff was in possession of any weapons, nor was he under the influence of any illegal drugs, nor had he committed any crime that day. (Prock Test. 69:18–23; McIntosh Test. 49:1–15.) Defendant Officers observed that Plaintiff, an eleven year-old boy, was sitting quietly on a bench and was not out of control. (Prock Test. 63:17–25, 65:16–18; McIntosh Test. 42:10–18, 47:2–16.) Prior to handcuffing Plaintiff, Officer Prock did not ask the school staff if they could call a relative to pick up Plaintiff or handle the matter themselves. (Prock Test. 71:20–72:1.)

Drawing all inferences in favor of Plaintiff, a reasonable jury could find, as the jury did here, that Defendant Officers did not have reasonable cause to believe that Plaintiff, a small four foot eight inch tall, eighty pound, eleven year old boy sitting quietly on a bench in the schoolyard, was subject to temporary custody under the California Welfare & Institutions Code. The evidence is not so one-sided that a reasonable police officer could only have believed that it was lawful to place Plaintiff in handcuffs, detain him in a police vehicle, and remove him from school.

Defendants' motion for judgment as a matter of law on Plaintiff's Fourth Amendment unlawful seizure claim is DENIED.

### b) *Excessive Force*

Defendants also move for judgment as a matter of law on Plaintiff's excessive force claim on the grounds of qualified immunity.

### (1) *Constitutional Violation*

The threshold inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation. *Wilkins v. City of Oakland,* 350 F.3d 949, 954 (9th Cir.2003).

Excessive force claims are examined under the Fourth Amendment's prohibition against unreasonable seizures. *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Fourth Amendment analysis requires balancing of the quality and nature of the intrusion on an individual's interests against the countervailing governmental interests at stake. *Id.* at 396, 109 S.Ct. 1865. Use of force violates an individual's constitutional rights under the Fourth Amendment where the force used was objectively unreasonable in light of the facts and circumstances, judged from the perspective of a reasonable officer on the

scene rather than with the 20/20 vision of hindsight. *Id.* at 396–397, 109 S.Ct. 1865. The government's interest in the use of force is evaluated by examining the totality of the circumstances, including the three core *Graham v. Connor* factors: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Bryan v. MacPherson,* 630 F.3d 805, 818 (9th Cir.2010) (quoting *Graham,* 490 U.S. at 396, 109 S.Ct. 1865).

Defendants contend that handcuffing is standard practice and is not, in and of itself, excessive force as a matter of law. In support, Defendants cite two non-precedential district court decisions from outside the Ninth Circuit, *Davenport v. Rodriguez,* 147 F.Supp.2d 630 (S.D.Tex.2001), and *Peters v. City of Biloxi, Miss.,* 57 F.Supp.2d 366 (1999). As stated in the memorandum decision denying Defendants' motion for summary judgment, this argument misses the point. Even minor uses of force may be unreasonable where the circumstances do not warrant use of any force.

■ The jury concluded that Defendants violated Plaintiff's Fourth Amendment right not to have excessive force used against him under the totality of the circumstances. (Verdict 2, ECF No. 174.) Jury Instruction No. 13 properly instructed the jury on the *Graham v. Connor* factors and also included the instruction, over Plaintiff's objection, that "An officer need not use the least intrusive means in taking a minor into custody." (Jury Instructions 14–15, ECF No. 172.)

The *Graham* factors support the jury's verdict. The first *Graham* factor, severity of the crime at issue, favors a finding of excessive force. Defendant Officers testified that they did not believe Plaintiff was in possession of any weapons, was not under the influence of any illegal drugs, nor had he committed any crime that day. (Prock Test. 69:18–23; McIntosh Test. 49:1–15.) As to the second *Graham* factor, whether the suspect poses an immediate threat to the safety of the officers or others, Defendant Officers did not feel that Plaintiff posed any direct danger to his safety, and did not believe Plaintiff was a threat to anyone's safety. (Prock Test. 68:13–20, 69:4–7.) Defendant Officers, however, both testified that Coach Sinclair told them Plaintiff was a "runner," although she did not specify what she meant by that term. (Prock Test. 64:3–7; McIntosh Test. 47:21–25.) The third *Graham* factor, whether the suspect is actively resisting arrest or attempting to evade, also weighs in favor of finding excessive force. When told to do so, Plaintiff immediately stood up and put his hands behind his back. (Prock Test. 72:11–20.) Officer Prock testified that Plaintiff was completely cooperative and did not resist at all. (Prock Test. 73:14–74:1.)

Drawing all inferences in favor of Plaintiff, the evidence is not so one-sided that Defendants are plainly entitled to judgment as a matter of law on the issue of excessive force. A reasonable jury could, as this jury did, find that it was unreasonable to handcuff a cooperative, passive eleven year old not suspected of any criminal activity.

### (2) *Qualified Immunity*

■ The next question in the qualified immunity analysis is whether the right was "clearly established" on the date of the incident. *Pearson v. Callahan,* 129 S.Ct. at 814. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This

inquiry is wholly objective and is undertaken in light of the specific factual circumstances of the case. *Id.* at 201, 121 S.Ct. 2151. "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan,* 129 S.Ct. at 823. The protection of qualified immunity applies regardless of whether the government official makes an error that is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* at 818 (quoting *Groh v. Ramirez,* 540 U.S. 551, 567, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (KENNEDY, J., dissenting)).

■ Defendant Officers contend that they are entitled to qualified immunity because a reasonable officer would believe that his actions were lawful under California Institutions Code §§ 625 and 601 and Penal Code §§ 835 and 847. California Welfare and Institutions Code §§ 625 and 601 authorize officers to take a juvenile into temporary custody if the juvenile is beyond the control of the guardian. California Penal Code § 835 provides that a person arrested "may be subjected to such restraint as is reasonable for his arrest and detention." Cal. Pen.Code § 835. In assessing the state of the law at the time of an incident, however, courts need look no further than *Graham*'s holding that "force is only justified when there is a need for force." *Blankenhorn v. City of Orange,* 485 F.3d 463, 481 (9th Cir.2007).

The evidence presented at trial does not establish that, as a matter of law, Defendant Officers' use of force was reasonable. Defendant's police practices expert Don Cameron, testified that a reasonable officer would know that he should take into account a minor's age, weight and height relative to the officers' weight and height, the number of adults surrounding the minor, the minor's calm and non-agitated state, the lack of severity of the situation at hand, the minor's lack of resistance, and the minor's lack of flight or attempted flight when assessing what force is objectively reasonable. (Cameron Test. 32:5–25, 33:1–25, 34:1–9, 42:13–25, 43:1–25, 44:1–12, August 26, 2011.) There simply was no need for use of any force whatsoever. Defendant Officers handcuffed Plaintiff when he was eleven years old, four feet eight inches tall, and eighty pounds, sitting calmly and quietly on a school bench with his head down, surrounded by four to five adults in close proximity, with the closest exit the length of a football field away. (Prock Test. 64:8–14, 24–25, 65:1–11; McIntosh Test. 56:9–16, 72:4–12; Pl. Test. 112:4–6, August 24, 2011; Amy Banks Test. 208:7–9, August 24, 2011.)

Ron Martinelli, Plaintiff's police practices expert, testified that he worked juvenile crimes and never handcuffed a child eleven years old or younger. (Martinelli Test. 56:2–14, August 30, 2011.). Martinelli also testified that no reasonable officer would think it necessary nor objectively reasonable to handcuff a child in the totality of circumstances present in this case. (Martinelli 36:1–12, 36:21–25, 37:1–8, 38:22–25, 1–25, 48:17–25, 49:1–17.) Defendants admit that there was no reasonable probability that Plaintiff could run away from three law enforcement officers standing around him. (McIntosh Test. 56:9–16.)

Drawing all the inferences in Plaintiff's favor, a jury presented with all the evidence could reasonably conclude that, under all the circumstances, a reasonable police officer would not have believed it was lawful to place Plaintiff in handcuffs, detain him in a police vehicle, and remove him from school.

Defendants' motion for judgment as a matter of law on Plaintiff's Fourth Amendment excessive force claim is DENIED.

## c) *Municipal Liability*

A municipality may be held liable under Section 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To prevail under a Section 1983 claim against a local government, a plaintiff must show: (1) he or she was deprived of a constitutional right; (2) the local government had a policy; (3) the policy amounted to a deliberate indifference to his or her constitutional right; and (4) the policy was the moving force behind the constitutional violation. *Burke v. Cnty. of Alameda,* 586 F.3d 725, 734 (9th Cir.2009). There are three ways to show a municipality's policy or custom:

> (1) by showing "a longstanding practice or custom which constitutes the standard operating procedure' of the local government entity;" (2) "by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision;" or (3) "by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate."

*Menotti v. Seattle,* 409 F.3d 1113, 1147 (9th Cir.2005) (quoting *Ulrich v. S.F.,* 308 F.3d 968, 984–85 (9th Cir.2002)).

Jury Instruction No. 11 properly instructed the jury that municipal liability attaches if Officers McIntosh and/or Prock acted "pursuant" to an expressly adopted official policy or long standing practice or custom of the City of Sonora, and defined "official policy" and "practice or custom." (Jury Instructions 11, ECF No. 172.) Officer Prock testified that it was his belief that he had to handcuff everyone riding in the backseat of his vehicle no matter whether the person was under arrest or posed any particular safety threat. (Prock Test. 101:11–25, 102:1–5, 20–25.) Chief McIntosh ordered Plaintiff to be handcuffed after only being on scene three and a half minutes with little to no investigation and almost no information, particularly no information that Plaintiff was any threat or that there was cause to believe that Plaintiff had committed any crimes. Coach Sinclair testified that from her experience with dealing with the Sonora Police Department at Sonora Elementary School, any time the police took a child off campus, whether for medical reasons, drugs, or a fight, the child was handcuffed. (Sinclair Test. 48: 1–6, August 25, 2011.)

Coach Sinclair testified that police were summoned to Sonora Elementary School fifty times in the three years prior to the incident. Students were handcuffed during twenty, or less than half, of those incidents; thirteen incidents were non-criminal. (Sinclair Test. 11:1–12:13.) Coach Sinclair asked if handcuffing Plaintiff was really necessary and was told it was "procedure." Coach Sinclair understood the handcuffing was "procedure" according to her past dealings with City officers. (Sinclair Test. 47:18–48:6.)

From this evidence, a reasonable jury could conclude that the City of Sonora had an official policy or long standing practice or custom of handcuffing juvenile detainees without regard to whether such force was reasonable or necessary under the circumstances. Defendants' motion for judgment as a matter of law on Plaintiff's Fourth Amendment claim against the City of Sonora is DENIED.

### 2. *Plaintiff's State Law Claims*

#### a) *Intentional Infliction of Emotional Distress*

Defendants move for judgment as a matter of law on Plaintiff's intentional in-

fliction of emotional distress claim. Defendants argue that: (1) there was insufficient evidence at trial to support Plaintiff's claim for intentional infliction of emotional distress; and (2) they proved their affirmative defense that their actions were lawfully privileged.

### (1) *Evidence of Plaintiff's Claim*

A cause of action for intentional infliction of emotional distress exists when there is "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Hughes v. Pair*, 46 Cal.4th 1035, 1050, 95 Cal.Rptr.3d 636, 209 P.3d 963 (2009) (internal quotations and citation omitted). A defendant's conduct is "outrageous" when it is so "extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id.* at 1051, 95 Cal. Rptr.3d 636, 209 P.3d 963. The defendant's conduct must also be "intended to inflict injury or engaged in with the realization that injury will result." *Id.*

Defendants contend that there is no evidence of "outrageous conduct". Jury Instruction No. 17 properly instructed the jury on the elements of intentional infliction of emotional distress and defined outrageous conduct. (Jury Instructions 20, ECF No. 172.) Plaintiff testified that the handcuffs hurt him and he started to cry because he was scared. (Pl.Test. 126:18–25.) Defendant Officers testified that they did not explain to Plaintiff why he had been handcuffed, that he was not under arrest, or where they were taking him. (Prock Test. 72:23–24, 73:10–13, 75:9–11; McIntosh Test. 54:21–25, 59:19–23, 69:3–8.) In the police vehicle, Officer Prock told Plaintiff that if he needed to take his medication, he should have take

his medication. (Prock Test. 99:2–25.) There is sufficient evidence of Defendant Officers' outrageous conduct in their treatment of a cooperative, passive, non-threatening juvenile.

Defendants further contend that there is no evidence Defendant Officer's conduct caused Plaintiff severe emotional distress. Defendants contend that Dr. Schreier testified that the period of psychological trauma lasted three or four months. (Schreier Test. 140:3–5, August 26, 2011.), but that Plaintiff is doing quite well now and is no longer on medication. (Schreier Test. 132:23–133:3.) Plaintiff's counselor Jennifer Murton testified that in her opinion, Plaintiff had not sustained any injury as a result of the police conduct. (Murton Test. 113:1–20, August 26, 2011.)

The jury's verdict, however, was sufficiently supported. Jury Instruction No. 19 properly defined severe emotional distress, Jury Instruction No. 23 properly set forth the requirement for causation, Jury Instruction No. 24 properly set forth the standard of proof on damages, and Jury Instruction No. 25 properly set forth the standard for aggravation of preexisting conditions. (Jury Instructions 22, 26–29, ECF No. 172.)

Plaintiff testified that he started crying after Defendant Officers handcuffed him because he was scared. (Pl. Test. 126:22–25.) When Plaintiff's mother saw him that afternoon, she said he was crying, did not want to talk about anything, did not want to discuss anything, and looked quiet and sad. (Amy Banks Test. 193:11–25.) Plaintiff's father testified that the day of the incident Plaintiff was very dejected and down, very quiet, standoffish, lacking in energy, did not eat much and went right to bed. (Matt Banks Test. 155:11–17, 156:9–24, August 24, 2011.) Plaintiff's uncle testified that when he saw Plaintiff arrive in handcuffs, he was shaken and obviously

emotionally and psychologically torn up over the situation. (Mark Banks Test. 95:23–96:5, August 25, 2011.)

Plaintiff's psychiatric expert Dr. Herbert Schreier, who treated Plaintiff from 2006 to 2008, testified that he believed Plaintiff suffered from an acute stress response to the incident. (Schreier Test. 125:20–25.) Schreier testified that Plaintiff had really poor sleep with nightmares, sleep disturbances at night, slept a lot during the day, was avoiding things, was nervous when he saw a police car, was having blackouts and losing time, and became anxious. (Schreier Test. 128:6–19:2.) Schreier testified that anger displacement is a recognized phenomenon in children, that a symptom of trauma is not wanting to talk about the worst aspects of the trauma or return to the place of the trauma, and that psychological testing showed Plaintiff minimizes his symptoms when expressing how he feels about the incident. (Schreier Test. 124:7–19, 125:6–9, 127:25, 128:1–5, 129:8–14, 130:12–25, 131:1–9, 132:10–18.)

Plaintiff testified that the incident made him sad and not know who to trust. (Pl. Test.132:15–25.) Plaintiff and his parents testified that Plaintiff was very depressed, having difficulties at home, did not want to eat anything, had a hard time sleeping or slept too much, started wetting his bed again, did not want to talk to anyone, and just wanted to stay at home. (Pl. Test. 134:13–17; Matt Banks Test. 157:24–158:13; Amy Banks Test., 195:18–196:19.) Plaintiff's father testified that it was hard to get Plaintiff to feel better after the incident and to participate in football. (Matt Banks Test. 160:23–161:3.) Plaintiff's father testified that Plaintiff had a hard time with other kids and felt he was a "bad kid" after the incident. (Matt Banks Test. 159:21–160:3.) There were rumors going around town about Plaintiff after the incident. (Amy Banks Test. 198:2–35.)

Plaintiff testified that he did not want to go back to Sonora Elementary School because he was scared people would make fun of him or be scared of him. (Pl.Test. 131:22–132:6.) Plaintiff was out of school for three months. (Matt Banks Test. 158:20–159:2.)

Plaintiff's father testified that Plaintiff already had emotional difficulties before the incident and had already been seeing Dr. Schreier, but after the incident it became compounded and his behavior became worse than before. (Matt Banks Test. 169:4–15.) Dr. Schreier described Plaintiff as suffering from "regression" after the incident (Schreir Test. 127:25–128:5.)

There was very substantial evidence that Plaintiff suffered severe emotional distress as a result of his treatment by the police, by being placed in handcuffs, and the manner in which he was removed and transported from school under the totality of the circumstances.

### (2) *Lawful Privilege*

Defendants further contend that they are entitled to judgment as a matter of law on Plaintiff's claim for intentional infliction of emotional distress because their actions were lawfully privileged. Jury Instruction Number 20 instructed the jury on the elements of privilege. (Jury Instruction 20, ECF No. 172.) The jury returned its verdict concluding that Defendants did not prove their entitlement to the privilege affirmative defense by a preponderance of the evidence. (Jury Verdict 9, ECF No. 174.). As discussed above with respect to Plaintiff's Fourth Amendment claim for unlawful seizure, there is sufficient evidence to support the jury's conclusion that given the circumstances, Defendants were not exercising a legal right to take Plaintiff into temporary custody under law and Defendants did not have a good faith belief that they had a legal right to take Plaintiff

into temporary custody and to use reasonable force to effectuate and continue that custody.

Defendants' motion for judgment as a matter of law as to Plaintiff's claim for intentional infliction of emotional distress is DENIED.

### b) *False Imprisonment*

 Defendants move for judgment as a matter of law on their affirmative defense of having probable cause to take Plaintiff into temporary custody. Defendants assert that they were authorized to take Plaintiff into temporary custody without a warrant pursuant to California Welfare and Institutions Code §§ 625 and 601. For the reasons discussed in respect to Plaintiff's claim for unlawful seizure, Defendants have not offered sufficient evidence to prove probable cause as a matter of law.

Defendants' motion for judgment as a matter of law as to Plaintiff's claim for false imprisonment is DENIED.

### 3. *Offset*

 Defendants contend that they are entitled to offset for all monies paid by Defendant School District of Sonora ("School District") and Coach Sinclair. Defendant School District settled Plaintiff's claims for $20,000 on November 6, 2009. (Pet. Approval of Compr., ECF No. 48.) Plaintiff's claims against Coach Sinclair were dismissed with prejudice for no monetary payment. (Order ¶ 2, ECF No. 66.) As authority, Defendants cite a single district court case, *Velez v. Roche*, 335 F.Supp.2d 1022 (N.D.Cal.2004). *Velez* held that a nonsettling defendant may claim an offset for amounts paid in settlement only if two conditions are met:

> First, the nonsettling defendant must demonstrate that the settlement and award (against which the offset is sought) were for the same injury.... Second, the injury must be indivisible such that there is joint and several lia-

bility among the settling and nonsettling defendants.

*Id.* at 1041–42. Defendants have the burden of demonstrating their entitlement to the offset. *Id.* at 1042.

Defendants do not meet their burden on both elements. First, Defendants do not demonstrate that Defendant School District's settlement and award were for the same injury. Plaintiff sued Defendant School District for alleged discrimination on the basis of Plaintiff's disability and violations of Plaintiff's rights on account of his disability. Plaintiff's causes of action against Defendant School District were made pursuant to the California Unruh Civil Rights Act, Section 504 of the Rehabilitation Act, and Americans with Disabilities Act. (Amended Complaint 6, 11, 12, ECF No. 54.) In contrast, Plaintiff's claims against Defendant City of Sonora and Defendant Officers were for violation of the Fourth Amendment's protection against wrongful seizure and excessive force; false imprisonment; and battery. (*Id.* at 7, 8, 14, 15.) Although the injuries were related to the same incident, they are not the same violations of the same primary rights.

Second, Defendants have not shown that the injury was indivisible such that there is joint and several liability among Defendant School District and Defendant City of Sonora and Defendant Officers. Plaintiff asserted distinct claims against Defendant School District based on his disability. Defendants have not shown how Defendant School District could be jointly and severally liable for Defendants' actions arising from the arrest and use of force against Plaintiff.

Defendants' request for offset is DENIED.

## IV. *MOTION FOR NEW TRIAL AND REMITTITUR*

Defendants move for a new trial pursuant to Federal Rule of Civil Procedure 59(a) and for remittitur of the jury's award.

### A. *Legal Standard*

 A motion for new trial may be granted after a jury trial "for any reason for which a new trial has heretofore been granted in action at law in federal court." Fed.R.Civ.P. 59(a). "The grant of a new trial is 'confided almost entirely to the exercise of discretion on the part of the trial court.'" *Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir.1990) (quoting *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980)). A trial court may grant a new trial only if the jury's verdict was "against the clear weight of the evidence." *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1083 (9th Cir.2009). The court can weigh evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party. *Landes Constr. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987). A new trial may be granted "[i]f, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed ....'" *Id.* at 1371–72. The district court, however, may not grant a new trial "simply because it would have arrived at a different verdict." *Wallace v. City of S.D.*, 479 F.3d 616, 630 (9th Cir.2007).

### B. *Discussion*

#### 1. *Weight of Evidence*

 Defendants move for a new trial, arguing that the jury's verdicts were against the clear weight of the evidence. Defendants raise the same arguments that they made in support of their motion for judgment as a matter of law. Although a court has more discretion in granting a motion for a new trial than in granting a motion for judgment as a matter of law, for the reasons articulated above, a new trial is not appropriate. There was substantial evidence to support the jury verdict. Defendants' motion for new trial based on the weight of the evidence is DENIED.

#### 2. *Supplemental Jury Instructions*

Defendants also move for a new trial based on the alleged "errors and irregularities in the process of instructing the jury and answering their questions following the initial verdict." (Def. Mot. New Trial 7, ECF No. 178.)

On August 31, 2011, the jury initially returned a verdict that the court deemed inconsistent. The jury initially found no liability on Plaintiff's Fourth Amendment claims and found liability for intentional infliction of emotional distress, but concluded that there was privilege for the intentional infliction of emotional distress. The jury nonetheless calculated and awarded damages for intentional infliction of emotional distress. Due to a typographical error in the verdict form as to how to answer the next question, the jury did not return a verdict on Plaintiff's state law claim for false arrest. The court concluded that the jury verdict was incomplete and inconsistent and reconvened the jury. The court explained that the verdicts were inconsistent due to a typographical error in the verdict form. (Tr. Trans.8, August 31, 2011.) The jury left the courtroom, then indicated that they had a question and returned to ask the court:

> Clarify question 8 [affirmative defense to intentional infliction of emotional distress]. If we said yes to all on page 23

of Jury Instruction # 20 [affirmative defense to intentional infliction of emotional distress—privilege] doesn't that mean we answer yes to page 9 in verdicts of trial jury [affirmative defense to intentional infliction of emotional distress—privilege]?

(Jury Notes 6, ECF No. 185.)

In response to this question and additional jury questions, the court gave several explanations of the elements of intentional infliction of emotional distress and Defendants' affirmative defense of privilege. Defendants contend that this was improper, and the court should have instead reread the original instructions or simply answered the jury's questions with either "yes" or "no." Defendants contend that the court's oral instruction had the improper effect of telling the jury that Plaintiff's rights were violated. This is categorically wrong and demonstrates ignorance of federal jury practice.

The court's resubmission of the inconsistent original verdict to the jury was proper. The Ninth Circuit has explained:

[W]hen the jury is still available, resubmitting an inconsistent verdict best comports with the fair and efficient administration of justice. Allowing the jury to correct its own mistakes conserves judicial resources and the time and convenience of citizen jurors, as well as those of the parties. It also allows for a resolution of the case according to the intent of the original fact-finder, while that body is still present and able to resolve the matter.

*Duk v. MGM Grand Hotel, Inc.*, 320 F.3d 1052, 1058 (9th Cir.2003).

■■■ The court has a duty to answer they jury's questions with additional instructions if necessary. *See United States v. Warren*, 984 F.2d 325, 330 (9th Cir. 1993); *see also United States v. Hayes*, 794 F.2d 1348, 1352 (9th Cir.1986) ("[T]he district court has the responsibility to eliminate confusion when a jury asks for clarification of a particular issue."). To determine whether a court's supplemental instructions to the jury are improper, a court must "consider whether the court's actions and statements were coercive in the totality of the circumstances." *Jiminez v. Myers*, 40 F.3d 976, 980 (9th Cir. 1993). Here, the jury asked for clarification of the jury verdict form and jury instructions. Their questions could not have been answered with a simple "yes" or "no" or reading of the jury instructions. In responding to the jury's questions, the court's answers were neutral, unbiased, repeatedly referred to the jury instructions, and emphasized that only the jury could make the ultimate determinations on the issues. The court's supplemental instructions and interactions with the jury were not coercive or improper and accurately stated the law. What Defendants wanted was an instruction that "spun" the direction of the jury in their favor.

■■■ Plaintiff is correct that Defendants' submission of the declaration of juror Russ Manfredo is entirely improper. Jurors may not testify about their internal deliberative process and the manner by which they reached their verdict. *United States v. Montes*, 628 F.3d 1183, 1189 (9th Cir.2011) (holding that even in cases of extraneous information entering the jury room, inquiries into how that extraneous information affected the mental process of the jurors is inadmissible); Fed.R.Evid. 606(b) ("[A] juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon the operation of a juror's mind or thought process, or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.")

Defendants' motion for new trial on the basis of the court's supplemental jury instructions is DENIED.

### 3. *Amount of Jury Award*

Defendants also move for remittitur of the jury's award to $3,000. Defendants contend that the jury's award of $285,000, 337 times the amount of treatment costs incurred by Plaintiff, is excessive as a matter of law and shocks the conscience.

■ The court may reverse a jury's finding on the amount of damages if the amount is "grossly excessive or monstrous," *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1040 (9th Cir.2003) (citation omitted), "clearly unsupported by the evidence," or "shocking to the conscience." *Brady v. Gebbie*, 859 F.2d 1543, 1557 (9th Cir.1988) (citations omitted). The jury's damage award does not meet this standard.

■ The Supreme Court has stated that Section 1983 damages may include "impairment of reputation, personal humiliation, and mental anguish and suffering." *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1086 (9th Cir.2009) (quoting *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986)). "[C]ompensatory damages may be awarded for humiliation and emotional distress established by testimony or inferred from the circumstances, whether or not plaintiffs submit evidence of economic loss or mental or physical symptoms." *Tortu*, 556 F.3d at 1086 (quoting *Johnson v. Hale*, 13 F.3d 1351, 1352 (9th Cir.1994).

■ Jury Instruction No. 24 properly instructed the jury that damages include:
2. The loss of enjoyment of life experienced and which with reasonable probability will be experienced in the future;
3. The mental, physical, emotional pain and suffering experienced and/or which with reasonable probability will be experienced in the future;

(Jury Instructions 27, ECF No. 172.) As detailed above, there is ample evidence that Plaintiff suffered mental and emotional damages resulting from the incident. The jury's damages award was not grossly excessive or monstrous or shocking to the conscience. The events were traumatic for Plaintiff and liability was severally imposed on each Defendant for severable conduct. Based on the mental health professional, Plaintiff suffered severe emotional distress.

Defendants' motion for remittitur is DENIED.

## V. *CONCLUSION*

For the reasons stated:

1. Defendants' motion for judgment as a matter of law is DENIED.

2. Defendants' motion for new trial and remittitur is DENIED.

SO ORDERED.

**ORDER ON DEFENDANTS' MOTION FOR STAY OF PROCEEDINGS TO ENFORCE JUDGMENT PENDING APPEAL WITHOUT SUPERSEDEAS BOND OR, IN THE ALTERNATIVE, WITH PARTIAL SUPERSEDEAS BOND**

### I. *INTRODUCTION*

Before the Court is Defendants City of Sonora, Chief of Police Mace Macintosh and Officer Hal Prock's (together, "Defendants") Motion for Stay of Proceedings to Enforce Judgment Pending Appeal without Supersedeas Bond or, in the Alternative, with Partial Supersedeas Bond ("Motion for Stay"). For the reasons set forth below, Defendants' motion will be DENIED.

## II. *FACTUAL BACKGROUND*

This civil rights action arises from Chief McIntosh and Officer Prock's September 29, 2008 arrest of Plaintiff, then an eleven year old student, at Sonora Elementary School. Plaintiff filed a Complaint (Compl., ECF No. 2) and an Amended Complaint (Am. Compl., ECF No. 54) alleging: (1) violation of the Unruh Civil Rights Act; (2) false imprisonment; (3) battery; (4) intentional infliction of emotional distress; (5) violation of Section 504 of the Rehabilitation Act of 1973; (6) violation of the Americans with Disabilities Act; and (7) civil rights claims under 42 U.S.C. § 1983 pursuant to the Fourth Amendment. Plaintiff settled his claims against Defendants Sonora School District and Karen Sinclair on November 6, 2009. Pet. Approval Compr., ECF No. 48.

The case was tried before a jury beginning on August 23, 2011. On September 1, 2011, the jury returned a verdict in Plaintiff's favor against Defendants and awarded Plaintiff $265,000 in damages against Defendants, as follows: $100,000 against the City of Sonora; $120,000 against Chief McIntosh; and $65,000 against Officer Prock. Verdict 12–13, 16, ECF No. 174. Although the jury found that Plaintiff was entitled to recover punitive damages against Chief McIntosh and Officer Prock, they did not award Plaintiff any punitive damages. *Id.* Plaintiff submitted a Bill of Costs for $11,063.08 (ECF No. 175), of which $5,633.29 was taxed (ECF No. 216). On September 30, 2011, the Court denied Defendants' Motion for a New Trial and Motion for Judgment as a Matter of Law (Order, ECF No. 194), granted Plaintiff $163,275 in attorneys' fees (Order, ECF No. 197), and entered Judgment in favor of Plaintiff against Defendants (J., ECF No. 195). Defendants filed an appeal of the Judgment. Not. Appeal, ECF No. 208. All proceedings to enforce the Judgment were stayed pending the Court's adjudication of the Motion for Stay. Order, ECF No. 211.

## III. *LEGAL STANDARD*

Under Federal Rule of Civil Procedure 62(a), a district court's judgment becomes final and enforceable fourteen days after judgment is entered. *Columbia Pictures Indus., Inc. v. Krypton Broad. of Birmingham, Inc.,* 259 F.3d 1186, 1197 (9th Cir.2001); Fed.R.Civ.P. 62(a). "At that time, a prevailing plaintiff is entitled to execute upon a judgment." *Columbia Pictures,* 259 F.3d at 1197.

Federal Rule of Civil Procedure 62(d) allows an appellant to stay the execution of a judgment pending appeal by posting a supersedeas bond. Fed.R.Civ.P. 62(d). "The stay takes effect when the court approves the bond." Fed.R.Civ.P. 62(d). The purpose of a supersedeas bond is to secure an appellee from a loss that may result from the stay. *Rachel v. Banana Republic, Inc.,* 831 F.2d 1503, 1505 n. 1 (9th Cir.1987). "The posting of a bond protects the prevailing plaintiff from the risk of a later uncollectible judgment and compensates him for delay in the entry of the final judgment." *NLRB v. Westphal,* 859 F.2d 818, 819 (9th Cir.1988). "Because the stay operates for the appellant's benefit and deprives the appellee of the immediate benefits of his judgment, a full supersedeas bond should be the requirement in normal circumstances." *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n,* 636 F.2d 755, 760 (D.C.Cir.1980).

District courts have "inherent discretionary authority in setting supersedeas bonds," *Rachel,* 831 F.2d at 1505 n. 1, including the discretion to allow alternative types of security or to waive the bond requirement. *Int'l Telemeter, Corp. v. Hamlin Int'l Corp.,* 754 F.2d 1492, 1495 (9th Cir.1985) ("Although Federal Rule of Civil Procedure 62 provides that a super-

sedeas bond may be used to stay execution of a judgment pending appeal, the court has discretion to allow other forms of judgment guarantee."); *Townsend v. Holman Consulting Corp.*, 881 F.2d 788, 796 (9th Cir.1989) ("[T]he district court has broad discretionary power to waive the bond requirement if it sees fit."), *vacated on reh'g on other grounds by* 929 F.2d 1358 (9th Cir.1990) (en banc) ("[W]e have held that the district court may permit security other than a bond."); *In re Combined Metals Reduction Co.*, 557 F.2d 179, 193 (9th Cir. 1977) ("Under Fed.R.Civ.P. 62(d), an appellant may obtain a stay as a matter of right by posting a supersedeas bond acceptable to the court. Since no bond was posted, the grant or denial of the stays was a matter strictly within the judge's discretion."); *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 757 F.Supp. 1101, 1104 (S.D.Cal.1990); *Aldasoro v. Kennerson*, 915 F.Supp. 188, 191 (S.D.Cal.1995). An appellant has the burden to "objectively demonstrate" the reasons for departing from the usual requirement of a full supersedeas bond. *Poplar Grove Planting & Refining Co. v. Bache Halsey Stuart, Inc.*, 600 F.2d 1189, 1191 (5th Cir.1979).

A waiver of the bond requirement may be appropriate where: (1) "the defendant's ability to pay the judgment is so plain that the cost of the bond would be a waste of money"; and (2) "the opposite case, . . . where the requirement would put the defendant's other creditors in undue jeopardy." *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 786 F.2d 794, 796 (7th Cir.1986); *Brooktree Corp. v. Advanced Micro Devices*, 757 F.Supp. 1101, 1104 (S.D.Cal.1990); *Aldasoro v. Kennerson*, 915 F.Supp. 188, 191 (S.D.Cal.1995). When determining whether to waive the supersedeas bond, courts have examined the following criteria:

(1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5) whether the defendant is in such a precarious financial position that the requirement to post a bond would place other creditors of the defendant in an insecure position.

*Dillon v. City of Chicago*, 866 F.2d 902, 904–05 (7th Cir.1988); 12–62 James Wm. Moore et al., *Moore's Federal Practice* § 62.03 (Matthew Bender 3d ed.); *United States v. Boyce*, 148 F.Supp.2d 1069, 1096 (S.D.Cal.2001) (quoting *Dillon*, 866 F.2d at 904–05).[1]

---

**1.** Plaintiff contends that Defendants' motion for an unsecured stay should be examined under the four-factor test applied to stays of non-monetary civil orders and judgments under Federal Rule of Civil Procedure 62(c). The four factors are:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Leiva–Perez v. Holder*, 640 F.3d 962, 964 (9th Cir.2011) (quoting *Nken v. Holder*, 556 U.S.

418, 129 S.Ct. 1749, 1761, 173 L.Ed.2d 550 (2009)). Plaintiff has not provided any legal authority to show that the test for appeals involving injunctive relief should be applied here, a case for appeal of a monetary judgment. The four-factor test is inapplicable. *See Bolt v. Merrimack Pharms. Inc.*, 2005 WL 2298423, at *2, 2005 U.S. Dist. LEXIS 46591, at *8 (Sep. 20, 2005) (concluding that the preliminary injunction test is "irrelevant in a case controlled by Rule 62(d)").

Plaintiff further contends that the history of the litigation and Plaintiff's status as a minor should also be taken into consideration. Plaintiff does not provide any authority to support this assertion; it is disregarded.

## IV. DISCUSSION

### A. Waiver of Supersedeas Bond

 Defendants contend that a supersedeas bond is not required to stay execution of the Judgment because they have adequately shown that they are capable of paying the Judgment if the Ninth Circuit affirms it, and that waiver of the supersedeas bond does not create any risk of nonpayment or otherwise harm Plaintiff. Plaintiff counters that Defendants have not met their burden to qualify for an unsecured stay, and that their sole evidence, the Declaration of Kenneth Wilkerson (Wilkerson Decl., ECF No. 210), is deficient. Given the evidence presented, the Court finds that Defendants have not met their burden to justify a departure from the normal full supersedeas bond.

Defendants rely solely on the declaration of Kenneth Wilkerson (Wilkerson Decl., ECF No. 210), an employee of AIMS. According to Wilkerson, AIMS is the third-party administrator for the Central San Joaquin Valley Risk Management Authority ("CSJVRMA"). Wilkerson Decl. ¶ 1. Wilkerson declares that the CSJVRMA defends and indemnifies Defendants, and will continue to do so through the appellate process until a final judgment is rendered. Wilkerson Decl. ¶ 3. Wilkerson declares that CSJVRMA will pay any and all judgments against Defendants in accordance with a formalized standard process that takes less than fifteen days from final judgment to distribution of payment. Wilkerson Decl. ¶¶ 4–6. Wilkerson further declares that for the 2008 to 2009 program year, CSJVRMA collected $8,900,000 to cover claims and administrative expenses. Wilkerson Decl. ¶ 7. Wilkerson declares that CSJVRMA's financial status has been, is, and will continue to remain stable; that CSJVRMA does not have a history of refusing payment to judgment creditors upon final judgment; and not once has CSJVRMA been rendered unable to issue a timely payment due to lack of funds or financial distress. Wilkerson Decl. ¶ 9.

First, Plaintiff questions Wilkerson's authority to speak for CSJVRMA. Wilkerson declares that AIMS is CSJVRMA's third-party administrator. Wilkerson Decl. ¶ 1. Plaintiff points out, however, that CSJVRMA's website names Bickmore Risk Services, not AIMS, as it management firm and claims administrator.[2] Plaintiff further questions Wilkerson's lack of authority to bind CSJVRMA to pay the liabilities of the two individual Defendants, Chief McIntosh and Officer Prock, who are not members of, nor insured by, CSJVRMA. In response, Defendants submit the Declaration of Jeannette Workman (Workman Decl., ECF No. 215–1), a CSJVRMA officer with the official title of Administrator, who declares that CSJVRMA "confirmed the truth and accuracy" of Wilkerson's declaration and provided Wilkerson with authorization and approval to execute his declaration. Workman Decl. ¶ 5. Workman's declaration addresses sufficiently Plaintiff's criticisms regarding Wilkerson's authority.

Second, Plaintiff contends that Wilkerson's declaration does not adequately show CSJVRMA's ability to pay the Judgment. From the evidence presented, Defendants' ability to pay the judgment is not "so plain

---

2. CSJVRMA's website provides:

 The CSJVRMA contracts with Bickmore Risk Services, a firm specializing in the management of joint powers authorities, to handle the day-to-day operations of the CSJVRMA. The firm's employees provide general administrative, financial management, underwriting, loss prevention, claims management, litigation management, risk management, accounting, and other services as necessary for the operations of the CSJVRMA.

 http://www.csjvrma.org/AboutCSVJRMA.aspx, HopkinsDecl. Ex. 3, ECF No. 213–1.

that the cost of the bond would be a waste of money." *Olympia Equip. Leasing Co.*, 786 F.2d at 796. Wilkerson declares that for the 2008 to 2009 program year, CSJVRMA collected $8,900,000 to cover claims and administrative expenses. Wilkerson Decl. ¶ 7. CSJVRMA's Monthly Liability Claim Report dated May 2011 states that as of May 2011, CSJVRMA had a total of $6,724,315.87 in current reserves to pay all of its 482 open claims. Hopkins Decl. Ex. 4, ECF No. 213-1. Plaintiff's $265,000 damage award, plus $163,275 attorneys' fees award, plus $5,633.29 in taxed costs, totals $433,908.29. As of May 2011, CSJVRMA's total reserves were over fifteen times Plaintiff's current award. In contrast, the appellant in *Federal Prescription Service, Inc. v. American Pharmaceutical Association*, 636 F.2d 755, 761 (D.C.Cir.1980), had a net worth of forty-seven times the damage award. More importantly, Defendants do not provide sufficient evidence that CSJVRMA has "a financially secure plan for maintaining that same degree of solvency during the period of an appeal." *Poplar Grove Planting & Refining Co. v. Bache Halsey Stuart, Inc.*, 600 F.2d 1189, 1191 (5th Cir.1979). Although Wilkerson declares that CSJVRMA has been, is, and will continue to remain stable, Wilkerson Decl. ¶ 9, Defendants do not provide any evidence to support this broad, conclusive statement. CSJVRMA's reserves have decreased by over two million dollars since CSJVRMA collected $8,900,000 for its 2008 to 2009 program year. CSJVRMA has fifty-five member cities and 482 open claims. Defendants have not provided any evidence that CSJVRMA's funds will be replenished, how it intends to pay 482 claims with less than seven million dollars, or how the funds will be allocated among the 482 outstanding claims. The Court does not have sufficient confidence in the availability of funds to pay the Judgment. In contrast, the appellant in *Dillon v. City of Chicago*, 866 F.2d 902, 904 (7th Cir.1988), provided evidence that appropriations were deposited annually into the fund that would pay plaintiff's judgment "in an amount designed to provide adequate funds for payment of such awards."

Defendants do not provide sufficient evidence to meet the burden for a stay without a full supersedeas bond under Federal Rule of Civil Procedure 62(d). Defendants' request for a stay without a supersedeas bond or a reduced bond is DENIED.

**B. *Temporary Stay***

 If the Court denies the Motion for Stay, Defendants request a temporary stay for a reasonable period of time to allow Defendants to post the supersedeas bond. Execution of the Judgment was already stayed fourteen days from its entry. Fed.R.Civ.P. 62(a). The Court imposed an additional stay pending adjudication of the Motion for Stay. Order, ECF No. 211. Defendants do not provide any authority for an additional stay. If Defendants wish to stay execution of the Judgment pending appeal, Defendants must file a supersedeas bond. A stay will take effect when the Court approves Defendants' supersedeas bond. Fed.R.Civ.P. 62(d). Defendants' request for a temporary stay is DENIED.

**C. *Amount of Bond***

 Plaintiff requests a supersedeas bond equal to at least $650,000 to incorporate post-judgment interest and attorneys' fees and costs for the appeal. Defendants contend that there is no justification, in law or the facts of the case, to warrant an increased bond.

Federal Rule of Civil Procedure 62(d) is silent as to the required amount of a supersedeas bond. *See* Fed.R.Civ.P. 62(d). The pre–1968 version of Rule 62(d), Rule 73(d), directed that the bond include "the

whole amount of the judgment remaining unsatisfied, costs on the appeal, interest, and damages for delay, unless the court after notice and hearing and for good cause shown fixes a different amount or orders security other than the bond." *Poplar Grove Planting & Refining Co. v. Bache Halsey Stuart, Inc.*, 600 F.2d 1189, 1191 (5th Cir.1979) (quoting Fed.R.Civ.P. 73(d)). The current Rule 62(d) has been applied consistently with its predecessor Rule 73(d). *Id.;* 12–62 James Wm. Moore et al., *Moore's Federal Practice* § 62.03 (Matthew Bender 3d ed.).

Plaintiff's damage award, attorneys' fees award, and taxed costs total $433,908.29. Local Rule 151(d) provides that "[w]hen required, a supersedeas bond shall be 125 percent of the amount of the judgment unless the Court otherwise orders." L.R. 151(d). The Court finds that the Eastern District of California's standard twenty-five percent enhancement will protect sufficiently Plaintiff's attorneys' fees and costs on appeal and post-judgment interest. To stay execution of the Judgment pending appeal, Defendants must file a supersedeas bond equal to 125% of Plaintiff's $433,908.29 award, or $542,385.36. Plaintiff's request for an enhanced supersedeas bond is DENIED.

## V. *CONCLUSION*

IT IS HEREBY ORDERED that:

1. Defendants' Motion for Stay is DENIED. If Defendants seek to stay the Judgment pending appeal, Defendants shall post a supersedeas bond equal to 125% of Plaintiff's $433,908.29 award, or $542,385.36. The stay shall become effective upon the Court's approval of the bond.

2. Defendants' request for a temporary stay is DENIED.

3. Plaintiff's request for an enhanced supersedeas bond is DENIED.

IT IS SO ORDERED.